[Nos. C030662, C031941, C032406. Third Dist. Oct. 31, 2000.]

JUDITH LESTER, Plaintiff and Respondent, v.
JAMES P. LENNANE, Defendant and Appellant.

## Counsel

Jerilyn L. Borack; Fancher & Wickland and Paige Leslie Wickland for Defendant and Appellant.

Eisen & Johnston Law Corporation, Jay-Allen Eisen, Marian M. Johnston, Frederic L. Snowden; and Claire M. Buckey for Plaintiff and Respondent.

## Opinion

**SIMS, J.**—In this child custody case, appellant James P. Lennane appeals from a series of orders made in the family court. In case No. C030662, Lennane appeals from a pretrial order made on July 22, 1998, limiting him to one hour a day of visitation with the newborn child of Lennane and respondent Judith Lester. In case No. C031941, Lennane appeals from a pretrial order made on November 13, 1998, also on the subject of temporary custody and visitation. In case No. C032406, Lennane appeals from a judgment after trial which awarded Lester primary physical custody of the child. We granted Lennane's motion to consolidate the appeals.

We shall dismiss the appeals in case Nos. C030662 and C031941 because the orders from which Lennane purports to appeal are nonappealable; rather, immediate review can be sought only by petition for writ relief. Nevertheless, Lennane is entitled to challenge those orders via his subsequent appeal from the judgment. Although his challenges to those orders, made in his

appeal from the judgment, would ordinarily be moot, we shall address them on the merits because they raise the serious charge of "gender bias" against a sitting judge of the family court. Concluding that Lennane's contentions as to both the temporary orders and the final judgment are without merit, we shall affirm the judgment in case No. C032406.

## FACTUAL AND PROCEDURAL BACKGROUND

Lennane, a former Sacramento resident living in Florida with his second wife and their eight-year-old daughter, but retaining business and family ties to Sacramento, met Lester in Sacramento in October 1997. Lester, a divorced woman with a 10-year-old daughter who lived with her, was the host of a local radio program about business.

Knowing of Lennane's history as a successful businessman in the Sacramento area before his relocation to Florida, Lester invited him on her program as a guest. Lennane appeared on the program in early November 1997, then saw Lester socially on the evenings of November 9 and 10. The second evening ended with an act of sexual intercourse. Lennane returned to Florida. No continuing relationship developed between the two.

After Lennane left Sacramento, Lester learned that she was pregnant. On December 23, 1997, she called him to tell him that she believed he was the father. Lennane at first urged Lester to have an abortion; she refused. At his insistence, she underwent DNA testing, which confirmed his paternity.

*Pretrial proceedings.*

On March 24, 1998, Lester filed a Uniform Parentage Act paternity complaint and a motion for custody, child support, and health and dental costs as to the parents' yet-unborn daughter; the motion also sought attorney fees and costs. She requested primary physical custody and joint legal custody to begin after the child's birth, expected to occur on or around June 15, 1998. In a supporting declaration, Lester acknowledged that Lennane desired a parental relationship with the child and averred: "It is my hope that our child will bond with her father and hopefully be afforded a relationship with Mr. Lennane's daughter, our daughter's half sister." She also averred that she was presently unemployed but hoped to resume full-time employment after her daughter's birth, that she had attempted to settle the matter with Lennane but had met with "evasiveness and . . . veiled threats," and that she feared Lennane would take unfair advantage of her if she did not file this action.

Lennane responded on May 13, 1998, by conceding his paternity and requesting an immediate custody evaluation and a long cause hearing to take

place on June 18 or 19, 1998, on custody and support issues. He argued that it was necessary to begin the evaluation now, "prior to any advantage either party could obtain from a de facto custody arrangement." In a supporting declaration, he averred that he sought physical custody of the child after her birth, but would not relocate to take custody: "The court will have to make the decision whether this child will reside with me in Florida or with the Plaintiff here in California." (He also questioned Lester's estimated date of delivery, calculating that since the child was conceived in November 1997, she ought to be born in August 1998.) He declared himself to be a retired businessman and offered to stipulate for guideline support purposes (Fam. Code, § 4056) that his income was "extraordinarily high."[1]

Lester opposed Lennane's request for an immediate custody evaluation. She now demanded sole legal and physical custody of the child. She asserted that her estimate of the child's birth date was based on the possibility that she would be unable to carry the child to term, due to the stress of the pregnancy, her preexisting health problems, and the surrounding circumstances (including Lennane's alleged hiring of an investigator to invade her privacy and his alleged demands for a late-term abortion).

The family court (Judge Charles C. Kobayashi) heard the parties' motions on May 20, 1998. Judge Kobayashi refused to make any order on custody at that time or to order an immediate custody evaluation, reasoning that any order or evaluation before the child's birth was premature. Judge Kobayashi also expressed concerns that a psychological evaluation at this time might stress Lester, whose health appeared not to be the best, and adversely affect the pregnancy. Judge Kobayashi did not sympathize with Lennane's position that the court needed to choose now whether the child belonged in Florida or California: "[H]e can stay here and parent the child with the mother if he wants to. He could move here. He's the one that came to Sacramento and impregnated this woman who now has—is going to bear the child. He could come to Sacramento and parent the child. [¶] Why should we suddenly take the child away to Florida because he lives there? The sexual intercourse took place in Sacramento. The jurisdiction is here. [¶] If you want to decide the issue of whether she should be better [sic] or he should have custody, we could do it here in Sacramento. If he wants to stay in Sacramento, I'd be willing to do that. But if he's going to Florida, I'm not going to do it."[2]

---

[1]A supporting declaration filed by Mark Sewell, CPA, averred that Lennane's net worth was in the range of $30 million to $45 million.

[2]Foreshadowing one of the leitmotifs of these appeals, Lennane's counsel argued that Judge Kobayashi was displaying "gender bias" by presuming Lester would have physical custody after birth merely because she was the birth mother. Judge Kobayashi disagreed, stating that (1) the child had been conceived in Sacramento, (2) he would not decide now whether the

However, Judge Kobayashi ordered that Lester turn over her medical records to Lennane, that he be allowed to participate in the birthing process, and that Lester provide him all current and ongoing information about the birth.

The next month, at Lennane's request, the parties met twice with marriage, family, and child counselor Carol Greenfield for confidential mediation regarding future custody arrangements. However, Lester walked out of the second session on July 9, 1998, claiming that the process was too stressful.

On July 10, 1998, Lester was hospitalized. Her doctor decided labor should be induced because the child's health was at risk.

Lester's then attorney, Donna DeCuir, left a voice mail message for Lennane's attorney, Jerilyn Borack, informing Borack that Lester was in labor; however, no one directly notified Lennane. The child, who was named Ava, was born on the morning of Sunday, July 12, 1998. DeCuir called Borack at home to tell her of the birth.

Ava was born premature, weighing only five pounds, seven ounces. She remained in an incubator for five days. When discharged from the hospital on July 17, 1998, her weight had dropped.

On July 14, 1998, two days after Ava's birth, Lennane brought an ex parte motion for joint legal and physical custody to both parents "pending mediation and evaluation." Lennane requested up to 12 hours of parenting time a day once Ava was released from the hospital. He proposed a shared "bird nesting" custody arrangement, where the parties would secure a home for the baby while maintaining their personal residences elsewhere.[3] He also requested, and the court issued, an order that the parents immediately begin nonconfidential mediation with Carol Greenfield.

Lester opposed the proposals for shared custody and bird nesting. She requested primary physical custody based on her intention to breast-feed Ava as soon as possible.

child should go to Florida or stay here, and (3) Lester would need to maintain physical custody after birth because she had expressed the intent to breast-feed the child.

[3]Lennane supported these requests with a declaration by forensic psychologist Frank Dougherty, Ph.D., a specialist in custody assessments. Dr. Dougherty declared that parental bonding begins immediately after birth and requires direct interaction with the infant for significant periods of time. He endorsed the bird nesting plan as in the best interests of the child, tending to promote emotional stability.

At the hearing on the motion, Judge Kobayashi declined to consider this declaration, first stating that it was hearsay, then indicating that he already had the expertise of Carol Greenfield to assist him and did not need declarations from experts paid by the parties.

The parties began court-ordered mediation with Greenfield on July 17, 1998. On July 19, Greenfield issued a report recommending one hour of visitation per day for Lennane from July 18 through July 27. Further mediation was scheduled for July 27.

Judge Kobayashi held a hearing on the motion on July 22, 1998. Lennane's counsel opposed Greenfield's recommendation. Judge Kobayashi felt that it was still premature to make any custody orders given the infant's precarious state of health, proposing instead that he set the matter for long cause hearing and that the parties return to Greenfield for further discussion in the meantime. At Lennane's counsel's insistence that an order be made, however, Judge Kobayashi adopted Greenfield's recommendation as a pendente lite custody order pending further mediation. Over Lester's objection, Judge Kobayashi also ordered the commencement of a custody evaluation by a court-appointed expert under Evidence Code section 730 (hereafter section 730), with directions that it be completed by November 24, 1998.[4]

Judge Kobayashi entered a minute order incorporating these rulings on July 22, 1998, and thereafter entered a formal order filed on September 15, 1998. On September 18, 1998, Lennane filed an appeal from the portions of the order which adopted Carol Greenfield's report as a court order.[5]

After meeting with Greenfield on July 27, 1998, Lester and Lennane agreed to increase Lennane's parenting time and to continue mediation weekly, with the option of revising the parenting plan later. Their agreement was entered as a court order on August 6, 1998.

On September 10, 1998, Greenfield reported to the court that the parties had agreed to increase Lennane's parenting time to four hours on Wednesdays, Thursdays, and Fridays, and Greenfield recommended that Lennane get two more one-hour days per week and that all of his parenting time take place away from Lester's residence. Lester did not agree to the latter proposals.

On September 14, 1998, Lennane filed an ex parte motion to modify the August 6 custody order in line with Greenfield's recommendation. At a

---

[4]Section 730 provides in part: "When it appears to the court, at any time before or during the trial of an action, that expert evidence is or may be required by the court or by any party to the action, the court on its own motion or on motion of any party may appoint one or more experts to investigate, to render a report as may be ordered by the court, and to testify as an expert at the trial of the action relative to the fact or matter as to which the expert evidence is or may be required. . . ."

[5]This appeal is case No. C030662.

hearing on September 21, 1998, Judge Kobayashi granted the motion.[6] He entered a formal order to that effect on October 15, 1998.

On November 3, 1998, Dr. Susan Fossum, the psychologist appointed by the court to perform the section 730 evaluation, issued her report. She recommended that Lennane receive sole physical custody and that Greenfield develop a short-term transitional plan to shift primary care away from Lester.

On November 12, 1998, Greenfield issued a report recommending that until the time of trial (set for January 25, 1999) Ava be with Lennane for eight hours a day every day and two overnights a week. Lester counter-proposed that Lennane care for Ava daily from Thursday through Monday with a single overnight on Saturday. Judge Kobayashi held a hearing on Greenfield's proposal on November 13.

Judge Kobayashi asked why Greenfield was recommending such a great increase in Lennane's custody time. Greenfield responded that Dr. Fossum's report raised the possibility that Lennane would receive physical custody of Ava after trial; however, Greenfield had no objection to Lester's alternative proposal so far as Ava was concerned. Greenfield said her plan might not be in Ava's best interests today, but would be "in the long run" if Ava wound up going to Florida.

After stating that he was "very troubled by this whole case" and finding that there was no definitive evidence of what amount of parenting time for Lennane would be in Ava's best interests, Judge Kobayashi made a new custody order which fell in between the proposals of Greenfield and Lester: Lennane would receive the child Mondays from 1:00 to 6:00 p.m., Wednesdays and Fridays from 9:30 a.m. to 5:30 p.m., and overnights from Saturday

---

[6]In their papers on the motion, each party accused the other of having been uncooperative during visitations and mediation sessions. Lester alleged that Lennane erupted in anger at a session and threatened both her and Greenfield. Lennane alleged that Lester had had two male friends over at his last visit, playing loud music and disrupting his visitation time.

Greenfield testified that Lennane had not threatened anyone (though confirming that he had shown anger) and indicated that Lester had become less cooperative out of a feeling that Lennane would just keep pushing for more concessions. Greenfield further testified that increased custody time for Lennane outside Lester's residence would be in Ava's best interests. However, Greenfield also testified that Lennane had accused her of gender bias and had suggested he could get the Legislature to change the laws in this area.

at 1:00 p.m. to Sunday at 1:00 p.m. The minute order was filed on November 13, 1998. Lennane filed an appeal from this order.[7]

On November 20, 1998, Lester moved under Code of Civil Procedure section 2032, subdivision (d), for an examination of Lennane's wife, Susan, and their daughter, Jamey, asserting that the examination was necessary because Dr. Fossum's report was biased. Lennane opposed the motion. After a hearing on December 7, 1998, Judge Kobayashi denied the motion without prejudice.

Lester renewed her motion on December 10, 1998, asking in the alternative for an examination of Susan and Jamey Lennane or for a new section 730 evaluation. The motion was set for hearing on December 29, 1998.

On December 21, 1998, Lennane moved to disqualify Judge Kobayashi under Code of Civil Procedure sections 170.1 and 170.3, alleging personal prejudice and bias. Unknown to Lennane, Judge Kobayashi had already issued a minute order transferring the case to Judge Gail D. Ohanesian for all further proceedings. On December 29, 1998, Judge Kobayashi filed a further minute order accepting the disqualification but explaining that the issue was moot because of the transfer to Judge Ohanesian.

On December 30, 1998, Judge Ohanesian denied Lester's motion for a new section 730 evaluation or for further examination of Susan and Jamey, but ruled that good cause existed for "a limited additional psychological evaluation" of Lennane. Judge Ohanesian also ruled that Lennane could hire his own expert to evaluate Lester.

*Trial.*

Trial on the issue of primary physical custody began on January 25, 1999, and lasted five days. Both parents testified, as did five child custody experts.

Lester testified that she was 37 years old and had a daughter, Brittany, now 11, by her ex-husband, Danny Cardenas. She and Cardenas had a shared 60/40 custody arrangement for Brittany. When custody issues arose, she and Cardenas could always work them out without going to court.

---

[7]This appeal is case No. C031941.

The parties later stipulated to modify this schedule, and the court made this stipulation a court order on January 12, 1999. Lennane filed his appeal from the earlier order on February 16, 1999.

Lennane asserts that the appeal was timely because no formal order was prepared and the minute order was not served, but does not address the court's later modification of the order per the parties' stipulation. We need not decide whether this appeal was timely, given our finding that the order appealed from was not appealable. (See pt. I of the Discussion, *post.*)

Lester had lived mainly in Sacramento since Brittany was born. She attended Sacramento City College from 1994 to 1996 and was again taking classes there. She had worked at various jobs, including legal secretary, real estate salesperson, and positions in broadcast media. She had quit her radio host job, but planned to resume her media career "on a limited basis"; she was currently working on Saturday mornings at a local radio station. She intended to remain in the Sacramento area, where she had family ties.

Lester grew up in a troubled home; her parents divorced when she was 11 and her mother remarried twice. Her mother and stepfather were alcoholics. Lester left home and became an emancipated minor at 16. By age 19, she had had two pregnancies and two abortions. She married Cardenas shortly after high school; they separated in 1991, when Brittany was 3. Lester had had a later relationship which included one incident of physical abuse in 1995, but left that relationship. In 1996 she became pregnant again and had another abortion.

When Lester was five months pregnant with Ava, she began a sexual relationship with her 24-year-old neighbor, Dejon Durio, but they were now only friends. She later learned that Durio had been the subject of a domestic violence complaint, but he had never been violent toward her, Brittany, or Ava. Lester was aware that Lennane was concerned about Durio's proximity to Ava.

According to Lester, Lennane had demanded early in the pregnancy that she get an abortion, and then had put unremitting pressure on her once Ava was born. His visits with Ava in Lester's home were also stressful.

Lennane testified that he was 59 years old and living in Naples, Florida; during the summer he and his family resided at Lake Tahoe. He had been coming to Sacramento on business about one week a month for the last two years.

Lennane admitted to having had three extramarital affairs in the last two years besides the one with Lester. (He had recently begun therapy to help him understand and deal with the problems in his marriage.) He also admitted that he had asked Lester to have an abortion and offered her money if she would do so.

Lennane had extensive parenting experience, first with the children from his prior marriage and then with Jamey, his daughter from the present

marriage. Although Jamey had always had a nanny, Lennane had taken care of her on a daily basis since birth.

Lennane testified that since Ava was born, he had continually tried to spend more time with her. Lester had just as continually resisted his efforts and his proposals for sharing custody.

Lennane and Lester generally praised each other's parenting of Ava.

Dr. Susan Fossum, the court-appointed custody evaluator, testified at length about her report, which was entered into evidence. Fossum opined that both parents were acting as primary caregivers to Ava and that Ava was securely bonded and attached to both.[8] Fossum recommended that Lennane receive sole custody because Lester's violent and traumatic childhood had instilled in her a pattern of seeking out violent and abusive men; Lennane showed greater maturity and judgment overall (aside from sexual escapades, where the two showed equally poor judgment); Lennane was better able to plan and to defer gratification; Lennane had a strong support system to help him parent Ava, but Lester did not; Lester's negative view of Lennane and inability to work out accommodations with him were troubling; and Lennane was the parent more likely to allow frequent and continuing contact with the other parent. Fossum would have made the same recommendation even if the parents had lived in the same city.

Dr. Frank Dougherty, a psychologist retained by Lennane, opined that according to the literature single-parent paternal custody is more beneficial than single-parent maternal custody, although this generalization cannot be used to predict individual outcomes. He also opined that children of two-parent households generally have fewer problems than children of one-parent households. Although he did not agree with Dr. Fossum's view that attachment and bonding begin at birth and are complete at six or seven months (see fn. 8, *ante*), he believed that it did not matter for bonding purposes that Lester had had physical custody of Ava since birth: Ava's attachment to both parents was probably at the same level now. However, if a single custodial parent must be chosen, it is better to make the choice as early as possible, before the child has become primarily attached to one parent or the other.

---

[8] Fossum had last seen Ava three months before, when Ava was three months old. In Fossum's opinion, children begin to bond with parents at birth and the bonding process is complete when the child is six or seven months old; therefore it is urgent to determine primary custody by that age.

Three psychologists retained by Lester—Drs. Herbert Weissman, Larry Nicholas, and Cynthia Neuman—harshly criticized Dr. Fossum's report and the investigative process that produced it.[9]

In Dr. Weissman's opinion, Dr. Fossum violated almost every applicable professional and ethical norm in her work on this case, and her report did not meet the standards of practice.[10] According to Dr. Weissman, Dr. Fossum produced opinions unsupported by the facts she obtained. She misused psychological test data. She mischaracterized the literature on bonding, which in fact shows that the bonding process does not even begin until six months of age. (See fn. 8, *ante*.) She formed a bias against Lester and then manipulated the data to fit that bias. She spent far more time interviewing Lester than Lennane, a deviation from standard procedure which was likely to load the scales against Lester because the more information one has about a party, the more it tends to magnify that party's blemishes. She formally evaluated Lester's daughter, but did not formally evaluate Lennane's daughter because Lennane and his wife denied permission; thus, any evaluation of Lennane's daughter that Fossum may have done was done unethically by subterfuge and was unreliable. She questioned Lester's daughter invasively and irresponsibly, performing more of an interrogation than a neutral fact-finding interview. She badgered Lester about money, harping on the topic even after Lester declined to answer on advice of counsel, then characterized Lester's answers as dissembling and dissimulation. She displayed a bias in favor of Lennane's wealth and affluent lifestyle, giving it far too much weight in assessing Ava's best interests. She failed to contact Lennane's adult children or the caregiver of his young daughter. She drew negative conclusions about Lester based on her interviews and testing, but failed to note the evidence of narcissism, defensiveness, and manipulative and controlling tendencies in Lennane's interviews and testing. She also failed to consider the possibility that the Lennanes might not have resolved their recent marital difficulties or the danger to Ava's best interests that any unresolved tensions in the marriage might produce.

Dr. Weissman declined to make any recommendation on custody, since he had not been retained to do so. He opined, in response to the court's question, that Lennane was the more likely parent to allow frequent and continuous contact with the other parent. However, based on Dr. Fossum's failure to demonstrate Lennane's superiority as a parent, Dr. Weissman saw no good reason to change the status quo.

---

[9] All three had great experience in doing section 730 custody evaluations. Dr. Weissman evaluated Lennane under Code of Civil Procedure section 2032 on Lester's behalf.

[10] Dr. Weissman noted that Dr. Fossum had listed him on her curriculum vitae as a former supervisor and that he had asked her to remove this listing because it misrepresented the facts.

Dr. Nicholas agreed with Dr. Weissman that Dr. Fossum's report showed inappropriate bias against Lester. Dr. Fossum disparaged her as to finances (a topic more relevant to child support than to custody) and as to the sexual relationship with Lennane, described in a "voyeuristic and moralistic" manner. Dr. Fossum's visit to the Lennanes' home at Lennane's expense was unnecessary and raised the appearance of impropriety. Furthermore, Dr. Fossum had ignored trouble signs in her data about the suitability of Lennane as a parent and the problems in his marriage.

In Dr. Nicholas's opinion, Dr. Fossum's scientific views were misguided. Dr. Fossum's claim that the bonding process begins at birth and concludes at six months clashed with the established consensus. Dr. Fossum's view that overnight visits would not cause detriment to a six-month-old infant was equally at odds with the literature, which supports beginning such visits around one year of age. Moreover, the latest research made clear that children need to be with their primary caretakers up until the age of three. Lester appeared to be the primary caretaker in this case because Ava had lived with her since birth and she cared for Ava almost every night.

Like Dr. Weissman, Dr. Nicholas concluded that Dr. Fossum's report fell below the standard of practice and evidenced "simple negligence." Also like Dr. Weissman, however, Dr. Nicholas would not directly opine as to whether any change in the custody status quo was advisable.

Dr. Neuman agreed with Drs. Weissman and Nicholas that Dr. Fossum's report fell below the standard of care. In Dr. Neuman's view, it would be "unwise" for the court to rely on the report. Barring evidence of major abuse, neglect, or psychopathology as to Lester, "it would appear that there would be no justification to uproot a child that young and implant her in an unfamiliar environment."

*The court's statement of decision.*

After trial, Judge Ohanesian issued a written ruling, later adopted as a statement of decision, awarding primary physical custody to Lester. The ruling states in part:

"1. *Status Quo.*

"Both parents have been actively involved in the child's life since birth. The child has lived with the Mother and Mother has been the primary care giver mostly due to biology and by virtue of court orders which are to be without prejudice at trial. Father has been actively involved in the child's life

at great sacrifice and hardship to himself and his family. . . . Dr. Fossum and Dr. Weissman both describe both parties as primary parents at this time. Both parties are able to provide a wholesome and stable environment for the child and are desirous of doing so. There is no detriment to the child in either home. . . .

"2. *No Gender Preference.*

"Family Code section 3040(a)(1) [*sic*] precludes the court from making a custody order based on preference of one gender over another. The expert witness testimony was consistent in noting that there is a biological basis for preferring the Mother as the primary parent in the first four months of life, all other things remaining equal; but at this stage, six months of age, there is no biological reason to prefer one gender over the other. And, of course, the law precludes the court from doing so.

"3. *No Economic Preference.*

"The law also precludes the court from using the parties' relative economic positions as a basis for a custody determination. . . .

"There was testimony that a two-parent home is superior to a one-parent home in terms of a child's best interests because of the additional stress involved when one parent alone is responsible for all the burdens of child rearing and perhaps juggling work obligations as well. While that may well be true, that is not an appropriate basis for a custody determination.

"4. *Emotional Needs.*

"The important factors for a custody determination are the emotional needs of the child, i.e., the need for continuity and stability; the harm caused by disruption of established patterns of care and emotional bonds; the ethical, emotional and intellectual guidance a parent gives to the child; the continuity of attention, nurturing and care; and a parent's character, disposition and emotional stability.

"The evidence shows that both parties are bonded to the child and love the child. The child has shown a level of attachment to both parents consistent with her age. The only experts who saw the child with each of the parents were Dr. Fossum and Dr. Weissman. Dr. Weissman indicated that due to the limitations of his evaluation, he was unable to determine which parent the child would turn to more, if either, for her emotional needs but he believes the likelihood is that the child would prefer the Mother based on primacy

principles. Dr. Fossum recommended that if custody goes to Father, there should be a three-month transitional period. That would require the Father spending an additional three months in Sacramento so the child could gradually spend longer periods of time away from Mother. Or it would require traveling back and forth with the child between California and Florida two times per month which seems to be excessive travel for a small child. There was no similar recommendation for a transition period should custody go to Mother. Thus, it is fair to conclude that the stronger bonding and attachment between parent and child at this time is with the Mother.

"However, the evidence is that the child is still in the early stages of attachment. Dr. Fossum and Dr. Dougherty suggest that the child could be moved to Florida at this time without undue harm and that the child could and would quickly form a primary attachment to Father.

"*5. History.*

"In terms of relevant history, the court finds that both parents have successfully co-parented their respective children from their first marriages without the need for litigation. . . .

"Mother was involved in an abusive relationship . . . . She extracted herself from the situation quickly and has not demonstrated a pattern of becoming involved with abusive men.

"*6. Frequent and Continuing Contact.*

"The child is entitled to frequent and continuing contact with both parents. One of the factors the court is required to consider in making a custody order is which parent is more likely to allow the child frequent and continuing contact with the non-custodial parent. (Family Code sections 3020, 3040.) The evidence in this case supports a finding that Father is the parent more willing to accommodate the other parent's rights. Mother's delay in notifying the Father that she was in labor, causing him to miss the birth of his child, was unreasonable. Her refusal prior to the birth to rationally discuss the actual date of conception was unreasonable. Her refusal to allow Father's wife access to the child in the hospital was unreasonable. The fact that Mother cannot even contemplate the child living with Father in Florida is of concern.

"*7. Judgment and Character.*

"[T]he court feels compelled to comment on the recklessly irresponsible conduct both parties have engaged in to create this beautiful child. Both

parties have demonstrated an equal lack of good judgment by engaging in unsafe sex without appropriate consideration for birth control. They risked exposing themselves and others to disease, gave no thought to how their conduct might affect their existing children and families, and no thought to what it would be like for Ava to grow up in these circumstances.

"Nor was this conduct an isolated lapse of judgment on the part of either party. Father who was and is married had been involved in extramarital sexual liaisons with at least three other women besides Ms. Lester in the 18 months before his encounter with Ms. Lester. Mother recently had an abortion from a sexual liaison she had in 1996. Mother's association with Dejon Durio is further cause to question her judgment as it relates to the child's best interests. The fact that Mother was and is single does not make her conduct any less troublesome than Father's.

"Father is a man of extraordinary superior accomplishments and great determination. He is a skilled communicator. He has taken positive steps to address the issues surrounding his extramarital indiscretions in therapy.

"Mother's attributes are that she is nurturing, warm and concerned. She is less sophisticated than and may be insecure in her relationship with Father. It is important that she learn to communicate with him and manage her stress so as not to affect Ava.

"8. *Education.*

"Both parents are committed to seeing that Ava obtains a good education. Father is better able to provide the intellectual stimulation to enhance Ava's education than Mother is.

"9. *Other Factors.*

"Ava has a half-sister Brittany, age 11, in Sacramento and a half-sister Jamey, age eight, in Florida. Ava would benefit from and deserves the opportunity of having a relationship with both of them. Ava has a grandmother in Sacramento and a grandmother in Florida. Father also has an adult daughter in Florida who has two young children . . . . Ava would benefit from all those relationships.

"10. *Court Must Choose One Primary Parent.*

"It is undisputed that the court must choose one primary parent. Mother lives in Sacramento and it is unreasonable to expect her to move to Florida.

Father lives in Florida and it is unreasonable to expect him to move to Sacramento.

"Mother argues that she is and has been the primary parent. That is the status quo and there is no compelling reason to change it.

"Father argues that the child has a primary attachment to both parents. The parties stand in an equal position at this time if gender is disregarded. The court should break the tie in favor of Father based on evidence that he is the parent more likely to share.

"The court finds that there is a level of attachment to both parents. The child has been spending overnights with Father with no reported negative effects. However, stability favors keeping the child's primary residence in Sacramento.

"The child was conceived in Sacramento and born in Sacramento. The Father has lived in Florida for the last 10 years. But before that he lived in Sacramento for 25 years and he still has significant business interests in Sacramento. He has been coming to Sacramento on business approximately once a month for about five days at a time for the last two years. He would like to liquidate his business interests and retire to Florida devoting his full attention to raising Ava. However, as of this time, he still has business reasons to travel to Sacramento on occasion. In addition, he has a mother-in-law in Rancho Murietta where he can stay when he has Ava. He has a sister-in-law in Carmichael and a son in San Francisco. He has a home in Lake Tahoe where he and his family spend two-and-a-half months each summer. Mother, on the other hand, has no connection with Florida.

"The court is persuaded that moving the child to Florida at this time and placing her in an all[-]new environment would be unnecessarily disruptive to the child.

"Mother has a proven history of being the primary parent of Brittany. Father is clearly devoted to both Jamey and Ava. But he has no similar history of being the primary parent over a sustained period of time. The court is not necessarily persuaded that custody to Father is a now or never proposition. If Father keeps a consistent presence in Ava's life and circumstances change so as to warrant review and modification of this order, custody to Father could be considered at some later time. The court is persuaded that moving the child to Florida at this time is an unnecessary risk to take. Accordingly, the court makes the following orders in the best interests of the child.

"1. The parties shall share legal custody jointly. Mother to have primary physical custody. Child not to be removed from California for purpose of change of residence."[11]

Lennane filed an appeal from the ensuing judgment. (Case No. C032406.)

DISCUSSION

I

*The Temporary Custody Orders Are Nonappealable*

 We must first consider whether the temporary custody orders from which Lennane purports to appeal in case Nos. C030662 and C031941 are appealable. We shall conclude they are not.

A. *Appellant's statement of appealability required by rule 13 of the California Rules of Court.*

Rule 13 of the California Rules of Court (hereafter rule 13) provides in pertinent part that an appellant's opening brief must "contain either a statement that the appeal is from a judgment that finally disposes of all issues between the parties or a statement explaining why the order or nonfinal judgment is appealable."

 Where an appeal is taken from an order other than a final judgment, rule 13's statement of appealability serves multiple purposes. First, it requires an appellant to make the preliminary and fundamental determination that the order appealed from is, in fact, an appealable order or judgment. (*Shpiller v. Harry C's Redlands* (1993) 13 Cal.App.4th 1177, 1179 [16 Cal.Rptr.2d 814].) Second, it demonstrates both to other parties *and to the Court of Appeal*, before work on the merits of a case is begun, why the order is appealable.

 Lennane's "statement of appealability" does not explain why the orders in case Nos. C030662 and C031941 are appealable. It says only: "Father has been unable to discover a ruling addressing whether temporary custody orders are independently appealable or only reviewable through an appeal of the final judgment. As Father's appeals of the two temporary custody orders have been consolidated with his appeal of the judgment, all issues are properly before the court. For the guidance of the family law bar,

---

[11]The statement of decision goes on to make detailed visitation orders which are not contested on appeal.

however, Father asks that this court make a ruling as to whether temporary custody orders are appealable prior to judgment."

Lennane's statement of appealability wholly fails to comply with the letter and purpose of rule 13. It cites no law whatsoever in support of appealability. Rather, it simply serves the question of appealability onto the court's side of the net and invites the court to undertake an independent analysis of appealability.

We requested supplemental briefing from the parties on the appropriate consequence to be assigned to Lennane's failure to comply with rule 13. As Lennane correctly points out, it would be unfair to dismiss his appeals from the temporary orders for failure to comply with rule 13, since no reported case has heretofore imposed such a sanction. Rather, we shall address the question (upon which we have received supplemental briefing) whether the temporary orders are appealable orders.

■ However, appellants should now be on clear notice that, in the future, a failure to comply fully with rule 13's requirement of a statement of appealability may result in our striking the appellant's opening brief, either on our own motion or upon motion of a party. A further failure to comply fully with rule 13 may result in our dismissal of the appeal for failure to submit a brief in compliance with the rules of court. (See *Berger v. Godden* (1985) 163 Cal.App.3d 1113 [210 Cal.Rptr. 109].)

■ Having considered the parties' supplemental briefs, we find that the orders are not appealable because there is no statutory or constitutional provision that authorizes appeals from such orders, and Lennane's analogies to other kinds of temporary orders that have been held appealable fail.

B. *No statute makes these orders appealable.*

In *Powers v. City of Richmond* (1995) 10 Cal.4th 85 [40 Cal.Rptr.2d 839, 893 P.2d 1160] (*Powers*), a plurality of our Supreme Court endorsed the view that the right of appeal in California is purely a creature of statute, not a constitutional right. (*Id.* at pp. 108-110 (plur. opn. of Kennard, J.).) As the plurality noted (*ibid.*), the overwhelming majority of Supreme Court and Court of Appeal decisions that considered this issue before *Powers* had taken the same view. (See, e.g., *Agricultural Labor Relations Bd. v. Tex-Cal Land Management, Inc.* (1987) 43 Cal.3d 696, 705 [238 Cal.Rptr. 780, 739 P.2d 140]; *People v. Chi Ko Wong* (1976) 18 Cal.3d 698, 709 [135 Cal.Rptr. 392, 557 P.2d 976]; *Lund v. Superior Court* (1964) 61 Cal.2d 698, 709 [39 Cal.Rptr. 891, 394 P.2d 707]; *Modern Barber Col. v. Cal. Emp. Stab. Com.*

(1948) 31 Cal.2d 720, 728 [192 P.2d 916]; *Trede v. Superior Court* (1943) 21 Cal.2d 630, 634 [134 P.2d 745]; *In re Marriage of Griffin* (1993) 15 Cal.App.4th 685, 687 [19 Cal.Rptr.2d 94]; *Steen v. Fremont Cemetery Corp.* (1992) 9 Cal.App.4th 1221, 1226 [11 Cal.Rptr.2d 780]; *In re Taya C.* (1991) 2 Cal.App.4th 1, 6 [2 Cal.Rptr.2d 810]; *Rao v. Campo* (1991) 233 Cal.App.3d 1557, 1564 [285 Cal.Rptr. 691]; *County of Monterey v. Mahabir* (1991) 231 Cal.App.3d 1650, 1653 [282 Cal.Rptr. 924]; *In re Eli F.* (1989) 212 Cal.App.3d 228, 232 [260 Cal.Rptr. 453]; *State Farm Fire & Casualty v. Hardin* (1989) 211 Cal.App.3d 501, 505 [259 Cal.Rptr. 433]; *Uptain v. Duarte* (1988) 206 Cal.App.3d 1258, 1261 [254 Cal.Rptr. 150]; *In re T. M.* (1988) 206 Cal.App.3d 314, 316 [253 Cal.Rptr. 535]; *Reisman v. Shahverd-ian* (1984) 153 Cal.App.3d 1074, 1088 [201 Cal.Rptr. 194]; *Redevelopment Agency v. Goodman* (1975) 53 Cal.App.3d 424, 432 [125 Cal.Rptr. 818]; *Draus v. Alfred M. Lewis, Inc.* (1968) 261 Cal.App.2d 485, 489 [68 Cal.Rptr. 154]; *Woodman v. Ackerman* (1967) 249 Cal.App.2d 644, 649 [57 Cal.Rptr. 687]; accord, *People v. Garrett* (1998) 67 Cal.App.4th 1419, 1421 [79 Cal.Rptr.2d 803]; *In re Daniel K.* (1998) 61 Cal.App.4th 661, 666 [71 Cal.Rptr.2d 764]; *Cobb v. University of So. California* (1995) 32 Cal.App.4th 798, 801 [38 Cal.Rptr.2d 543]. See generally 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 2, pp. 60-62.)[12]

The parties have cited no statute expressly making temporary custody orders appealable, and we have found none. If the right to appeal in California is purely a creature of statute, as the overwhelming weight of authority indicates, the lack of any statute giving a litigant the right to appeal from a temporary custody order forecloses the claim that such orders are appealable.

C. *There is no independent constitutional basis for the appealability of these orders.*

As noted, however, the dissent in *Powers, supra,* 10 Cal.4th 85, argued at great length that article VI, section 11, creates a constitutional right of appeal independent of statute. Only a plurality in *Powers* took the contrary view, and our Supreme Court has not definitively adopted that view in any

---

[12]A separate concurrence declined to reach the question whether the right of appeal in California is exclusively statutory. (*Powers, supra,* 10 Cal.4th at pp. 116-117 (conc. opn. of George, J.).) A dissent vigorously rejected the plurality's view, arguing that article VI, section 11 of the California Constitution (hereafter article VI, section 11) creates a right of appeal independent of statute. The dissent characterized the contrary statements in prior decisions as misguided dicta perpetuated by mindless repetition. (10 Cal.4th at pp. 124-174 (dis. opn. of Lucas, C. J.).)

later decision. Nevertheless, we decline to revisit that issue because, even assuming that article VI, section 11 creates an independent constitutional right of appeal, we find no basis for holding temporary custody orders appealable.

Article VI, section 11 provides in relevant part: "The Supreme Court has appellate jurisdiction when judgment of death has been pronounced. With that exception courts of appeal have appellate jurisdiction when superior courts have original jurisdiction in *causes* of a type within the appellate jurisdiction of the courts of appeal on June 30, 1995, and in other *causes* prescribed by statute." (Italics added.)

The term "causes" recurs in further provisions of article VI of the California Constitution, including section 14, which provides in part: "Decisions of the Supreme Court and courts of appeal that determine causes shall be in writing with reasons stated." ■ Our Supreme Court has recently held that a "cause" under article VI, section 14 is synonymous with an "action" or a "proceeding" under Code of Civil Procedure section 22. (*In re Rose* (2000) 22 Cal.4th 430, 452 [93 Cal.Rptr.2d 298, 993 P.2d 956] [petitions to Supreme Court for review of attorney discipline not "causes" requiring disposition by written opinion].) Because sections 11 and 14 of article VI are in pari materia, we construe "cause" to mean the same thing in both provisions. (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].)

■ Family law proceedings in which custody is at issue are actions within the meaning of Code of Civil Procedure section 22, hence causes within the meaning of article VI, section 11. (Fam. Code, §§ 110, 200, 213, subd. (b)(3).) However, the parties have cited no statute or case law declaring that a temporary custody order is itself a cause, and we have found none. Moreover, even though an action to adjudicate custody and visitation is a cause, it does not follow that the Legislature may not regulate the mode of appellate review in such proceedings so as to prohibit appeals from interlocutory judgments and orders therein. That is what the Legislature has done.

A temporary custody order is interlocutory by definition, since it is made pendente lite with the intent that it will be superseded by an award of custody after trial. (Fam. Code, §§ 3022, 3040, 3060-3062.) Code of Civil Procedure section 904.1 bars appeal from interlocutory judgments or orders "other than as provided in paragraphs (8), (9), and (11). . . ." (Code Civ.

Proc., § 904.1, subd. (a)(1)(A).)[13] Temporary custody orders are not listed in any of those paragraphs. Therefore this statute precludes the appealability of such orders.

This result is in accord with the general rule that, under the "one final judgment" rule, appeal lies only from final judgments in actions or proceedings, or from orders after judgment that affect the judgment or its enforcement; it does not lie from interlocutory judgments or orders unless specifically made appealable by statute. (Code Civ. Proc., § 904.1, subd. (a); *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 740-741 & fn. 9 [29 Cal.Rptr.2d 804, 872 P.2d 143]; *Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 651-656 [25 Cal.Rptr.2d 109, 863 P.2d 179]; *Olson v. Cory* (1983) 35 Cal.3d 390, 400 [197 Cal.Rptr. 843, 673 P.2d 720]; see generally 9 Witkin, Cal. Procedure, *supra*, Appeal, §§ 57-59, 135-140, pp.

---

[13]Code of Civil Procedure section 904.1, subdivision (a) provides: "(a) An appeal, other than in a limited civil case, is to the court of appeal. An appeal, other than in a limited civil case, may be taken from any of the following:

"(1) From a judgment, except (A) an interlocutory judgment, other than as provided in paragraphs (8), (9), and (11), (B) a judgment of contempt that is made final and conclusive by Section 1222, or (C) a judgment granting or denying a petition for issuance of a writ of mandamus or prohibition directed to a municipal court or the superior court in a county in which there is no municipal court or the judge or judges thereof that relates to a matter pending in the municipal or superior court. However, an appellate court may, in its discretion, review a judgment granting or denying a petition for issuance of a writ of mandamus or prohibition, or a judgment or order for the payment of monetary sanctions, upon petition for an extraordinary writ.

"(2) From an order made after a judgment made appealable by paragraph (1).

"(3) From an order granting a motion to quash service of summons or granting a motion to stay or dismiss the action on the ground of inconvenient forum.

"(4) From an order granting a new trial or denying a motion for judgment notwithstanding the verdict.

"(5) From an order discharging or refusing to discharge an attachment or granting a right to attach order.

"(6) From an order granting or dissolving an injunction, or refusing to grant or dissolve an injunction.

"(7) From an order appointing a receiver.

"(8) From an interlocutory judgment, order, or decree, hereafter made or entered in an action to redeem real or personal property from a mortgage thereof, or a lien thereon, determining the right to redeem and directing an accounting.

"(9) From an interlocutory judgment in an action for partition determining the rights and interests of the respective parties and directing partition to be made.

"(10) From an order made appealable by the provisions of the Probate Code or the Family Code.

"(11) From an interlocutory judgment directing payment of monetary sanctions by a party or an attorney for a party if the amount exceeds five thousand dollars ($5,000).

"(12) From an order directing payment of monetary sanctions by a party or an attorney for a party if the amount exceeds five thousand dollars ($5,000).

"(13) From an order granting or denying a special motion to strike under Section 425.16."

113-115, 201-207.) Article VI, section 11 does not of itself make interlocutory orders appealable merely because they occur *in* actions or proceedings, i.e., *in* a "cause." (*Powers, supra,* 10 Cal.4th at p. 161 & fn. 33 (dis. opn. of Lucas, C. J.); see *Title Ins. & Trust Co. v. Calif. etc. Co.* (1911) 159 Cal.484, 486 [114 P. 838].) Thus, even if article VI, section 11 is the ultimate source of appealability, it does not authorize an appeal from interlocutory, temporary custody orders.

### D. *The "collateral order" exception does not apply.*

■ One exception to the "one final judgment" rule codified in Code of Civil Procedure section 904.1 is the so-called collateral order doctrine. Where the trial court's ruling on a collateral issue "is substantially the same as a final judgment in an independent proceeding" (*In re Marriage of Skelley* (1976) 18 Cal.3d 365, 368 [134 Cal.Rptr. 197, 556 P.2d 297]), in that it leaves the court no further action to take on "a matter which . . . is severable from the general subject of the litigation" (*In re Marriage of Van Sickle* (1977) 68 Cal.App.3d 728, 735 [137 Cal.Rptr. 568]), an appeal will lie from that collateral order even though other matters in the case remain to be determined. (*Day v. Papadakis* (1991) 231 Cal.App.3d 503, 508 [282 Cal.Rptr. 548].) Lennane relies on this exception to the "one final judgment" rule, but his reliance is misplaced.

In determining whether an order is collateral, "the test is whether an order is 'important and essential to the correct determination of the main issue.' If the order is 'a necessary step to that end,' it is not collateral. [Citations.]" (*Steen v. Fremont Cemetery Corp., supra,* 9 Cal.App.4th 1221, 1227.)

Over 50 years ago, our Supreme Court stated the minimum conditions for the appealability of a collateral order: "It is not sufficient that the order determine finally for the purposes of further proceedings in the trial court some distinct issue in the case; it must direct the payment of money by appellant or the performance of an act by or against him." (*Sjoberg v. Hastorf* (1948) 33 Cal.2d 116, 119 [199 P.2d 668] (*Sjoberg*); accord, *In re Marriage of Skelley, supra,* 18 Cal.3d at p. 368; *Ponce-Bran v. Trustees of Cal. State University* (1996) 48 Cal.App.4th 1656, 1661 [56 Cal.Rptr.2d 358]; *Conservatorship of Rich* (1996) 46 Cal.App.4th 1233, 1235 [54 Cal.Rptr.2d 459]; *Efron v. Kalmanovitz* (1960) 185 Cal.App.2d 149, 155 [8 Cal.Rptr. 107].) However, in *Meehan v. Hopps* (1955) 45 Cal.2d 213 [288 P.2d 267] (*Meehan*), the Supreme Court appeared to some later courts to have held otherwise. (*Id.* at pp. 216-217 [order denying defendants' motion to disqualify plaintiffs' counsel and to enjoin counsel from disclosing confidential information related to case; held appealable because motion collateral to merits of

case and order finally determined defendants' rights as to opposing counsel]; see *In re Marriage of Lechowick* (1998) 65 Cal.App.4th 1406, 1410 [77 Cal.Rptr.2d 395]; *Marsh v. Mountain Zephyr, Inc.* (1996) 43 Cal.App.4th 289, 297-298 [50 Cal.Rptr.2d 493]; *Brun v. Bailey* (1994) 27 Cal.App.4th 641, 650-651 [32 Cal.Rptr.2d 624]; *Henneberque v. City of Culver City* (1985) 172 Cal.App.3d 837, 841-842 & fn. 3 [218 Cal.Rptr. 704]; all appearing to hold interlocutory orders appealable despite failure to direct payment of money or performance of act.) We agree with those courts that have held the *Sjoberg* rule remains the law of California, notwithstanding *Meehan.* (*Conservatorship of Rich, supra,* 46 Cal.App.4th at pp. 1236-1237; *Efron v. Kalmanovitz, supra,* at p. 155 [explaining that order in *Meehan* was appealable by statute because it denied injunctive relief (Code Civ. Proc., § 904.1, subd. (a)(6)) and pointing out that the *Meehan* court showed no intent to overrule *Sjoberg*].)[14]

■ The temporary custody orders here are not appealable under *Sjoberg* because they did not direct the payment of money or the performance of an act. They merely established terms for custody and visitation, permitting Lennane to avail himself of the parenting time he was awarded but not requiring him to do so.

In any event, the temporary custody orders here are simply not "collateral." Custody is the only disputed issue in this case (aside from related attorney fees and costs).[15] Furthermore, according to Lennane the temporary orders essentially rigged the final outcome against him: they created a status quo favoring Lester which the trial court used as the tiebreaker, under the rubric of "stability," in awarding her custody after trial. (See pt. IV, *post.*) Thus neither temporary order finally resolved any matter "severable from the general subject of the litigation." (*In re Marriage of Van Sickle, supra,* 68 Cal.App.3d at p. 735.)

Lennane cites decisions, including two from this court, which appear to treat temporary custody orders as appealable without saying why. (*Michael U. v. Jamie B.* (1985) 39 Cal.3d 787 [218 Cal.Rptr. 39, 705 P.2d 362]; *Polin*

---

[14] We also reject Lennane's assertion that the *Sjoberg* rule "is not meant literally, but rather requires that the order must not contemplate any further judicial action for enforcement and must instead immediately aggrieve the challenging party by deciding his legal rights or liabilities." We can see no reason why the court would have "literally" said the order must direct the payment of money or the performance of an act if the court did not mean it. It does not matter whether any prior decision cited in *Sjoberg* went so far: our Supreme Court was free to craft a new rule if it wished.

[15] It is true, as Lennane points out, that this litigation is nominally a paternity action under the Uniform Parentage Act. But paternity was never litigated because Lennane admitted it from the beginning.

*v. Cosio* (1993) 16 Cal.App.4th 1451 [20 Cal.Rptr.2d 714]; *Rogers v. Platt* (1988) 199 Cal.App.3d 1204 [245 Cal.Rptr. 532]; *In re Marriage of Schwander* (1978) 79 Cal.App.3d 1013 [145 Cal.Rptr. 325]; *Chichester v. Chichester* (1964) 228 Cal.App.2d 491 [39 Cal.Rptr. 553]; *De Freitas v. De Freitas* (1955) 133 Cal.App.2d 769 [285 P.2d 111].) As he concedes, however, these decisions are not authority for the proposition that such orders are appealable, because they do not consider that proposition. (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689].)[16]

Lennane finally cites the Law Revision Commission comment to Family Code section 3022, the general provision authorizing the trial court to make custody orders "during the pendency of a proceeding or at any time thereafter." This citation also fails to support him.

Lennane quotes the comment's end: "See also Code Civ. Proc. § 917.7 (order not automatically stayed by appeal)." (Cal. Law Revision Com. com., 29D West's Ann. Fam. Code (1994 ed.) foll. § 3022, p. 167.) He then asserts that this reference "assumes such [temporary custody] orders are appealable." We disagree. Family Code section 3022 also covers custody orders after trial, which are unquestionably appealable. Absent authority to the contrary, which Lennane does not cite, we presume that the comment refers to those orders.

---

[16]Lennane points out that a family law practice guide cites our decision in *Rogers v. Platt, supra,* 199 Cal.App.3d 1204, as authority for the premise that "pendente lite orders for support, *custody* and/or attorney fees and costs may be directly appealed as 'final judgments' on 'collateral matters' . . . ." (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 1999) ¶ 5:534, pp. 5-176.3 to 5-176-4 (rev. #1 2000), italics added.) For the following reasons, this citation does not help Lennane.

First, *Rogers v. Platt, supra,* 199 Cal.App.3d 1204, is the only authority Hogoboom and King cite for the appealability of temporary custody orders.

Second, they ignore the fact (which Lennane candidly acknowledges) that the published portion of our decision did not discuss appealability.

Third, in a passage which Lennane does not cite, they hedge by saying (again citing only to *Rogers v. Platt*) that temporary custody orders are "presumably" appealable and "relief by application for a writ is more often used because of delays in the normal appeal process." (Hogoboom & King, Cal. Practice Guide: Family Law, *supra,* ¶ 16:269, p. 16-53.)

Fourth, they ignore the fact that the order in *Rogers v. Platt* was not a standard pendente lite custody order but a jurisdictional order under the Parental Kidnapping Prevention Act (28 U.S.C. § 1738A) determining in which of two states the litigation could properly go forward. (*Rogers v. Platt, supra,* 199 Cal.App.3d at p. 1206.) Such an order is "collateral" under either line of authority discussed above, since it finally determines an issue separate from the general subject of the litigation (which parent should have custody) and orders the performance of an act (the parties' appearance in the court with jurisdiction over the matter). Thus, the appealability of jurisdictional custody orders under the Parental Kidnapping Prevention Act has no bearing on the appealability of ordinary *temporary* custody orders.

### E. *Lennane's analogy to other temporary orders fails.*

Lennane analogizes the temporary custody orders here to temporary orders for support or attorney fees in family law cases, which have been held appealable as collateral orders—including some which denied support or fee requests. (*In re Marriage of Skelley, supra,* 18 Cal.3d 365; *Sarracino v. Superior Court* (1974) 13 Cal.3d 1 [118 Cal.Rptr. 21, 529 P.2d 53]; *Greene v. Superior Court* (1961) 55 Cal.2d 403 [10 Cal.Rptr. 817, 359 P.2d 249]; *Lincoln v. Superior Court* (1943) 22 Cal.2d 304 [139 P.2d 13]; *Fish v. Fish* (1932) 216 Cal. 14 [13 P.2d 375]; *White v. White* (1890) 86 Cal. 212 [24 P. 1030]; *Sharon v. Sharon* (1885) 67 Cal. 185; *Askew v. Askew* (1994) 22 Cal.App.4th 942 [28 Cal.Rptr.2d 284]; *In re Marriage of Van Sickle, supra,* 68 Cal.App.3d 728; *Chichester v. Chichester, supra,* 228 Cal.App.2d 491.) The analogy is unpersuasive.

■ In *In re Marriage of Skelley, supra,* 18 Cal.3d 365, where the order at issue *reduced* temporary spousal support and *denied* attorney fees, the court noted (citing most of the above decisions) that appeals from temporary support orders had long been authorized. (*Id.* at pp. 367-368.) The court cited the *Sjoberg* rule, including the requirement that the order direct the payment of money or the performance of an act, as a controlling statement of the collateral order doctrine. (*Id.* at p. 368.) The court then noted: "An order for support is operative from the moment of pronouncement. And a final judgment excluding future support does not preclude recovery of all money due under a prior temporary support order. [Citations.]" (*Id.* at p. 369.) The court also quoted (*id.* at p. 368) the observation in *Sharon v. Sharon, supra,* 67 Cal. 185, the earliest decision on point, that an order for the payment of alimony and attorney fees is immediately enforceable by execution. (*Id.* at p. 195.) By the same token, where a party has obtained an order to reduce temporary spousal support, he or she can execute against the other spouse to recover any excess sums already paid since the date of filing the notice of motion or order to show cause. (See *In re Marriage of Skelley, supra,* 18 Cal.3d at p. 369.) Furthermore, where a motion for attorney fees has been denied, the moving party has in effect been directed to pay his or her own fees. Thus, temporary support and attorney fee orders, whether granting or denying relief, meet the *Sjoberg* test.

■ By contrast, the temporary custody orders here were not collateral because they went to the only disputed issue in the case. Moreover, they did not order Lennane to pay money or direct him to do any act; they merely gave him the opportunity to visit his child at set times if he chose to do so. Finally, unlike temporary support orders, there is no long line of authority holding temporary custody orders appealable; in fact, there is not a single

published decision that does so. For all these reasons, Lennane's analogy to temporary support and fee orders fails.

F. *The orders are also nonappealable on grounds of policy.*

But if the law left any room for doubt whether temporary custody orders are appealable, policy considerations would resolve the doubt. The very nature of such orders compels the swiftest possible review of any challenge. The writ process, not the appeal process, is the way to get that review.

In most custody dispute cases, young children bond with their primary custodial parents. The trial court must place the child's best interest first in any long-term custody decision. (Fam. Code, §§ 3011, 3040, subd. (b).) Thus, the child's bond with the primary custodial parent will often weigh heavily in the court's mind. Once the bond is established, the court is likely to find that the child's best interest requires preserving that bond to maintain stability in the child's life.

A noncustodial parent who seeks to obtain custody will often be at a disadvantage by the time of trial if the child has bonded with the custodial parent. The noncustodial parent's only effective recourse is to obtain immediate review of any objectionable temporary custody order. This can be done by filing a petition for writ, a procedure Lennane failed to use in this case. It cannot be done by filing an appeal which will sit in abeyance while the case works its way to trial and decision—and while the bond between child and custodial parent strengthens and deepens.

G. *Conclusion.*

For all of the above reasons, Lennane's purported appeals in case Nos. C030662 and C031941 are dismissed.

II

*The Merits of the Temporary Custody Orders*

A. *We shall review the temporary orders even though, in ordinary circumstances, they would be moot.*

We recognize, however, that Lennane contends he suffered prejudice in case No. C032406 because of the status quo created in part by the earlier temporary custody orders, which he claims were motivated mainly by impermissible "gender bias" against awarding primary physical custody to a

male parent. Therefore we review his claims of error as to those orders as part of our review of the final judgment. (Code Civ. Proc., § 906.) Our review of these claims of error, however, leads us to conclude that they would ordinarily be moot: even if error occurred, there is no effectual relief we could now grant Lennane as to the temporary custody orders.

■ "An appellate court will not review questions which are moot and which are only of academic importance." (*Keefer v. Keefer* (1939) 31 Cal.App.2d 335, 337 [87 P.2d 856]; see *Finnie v. Town of Tiburon* (1988) 199 Cal.App.3d 1, 10 [244 Cal.Rptr. 581].) A question becomes moot when, pending an appeal from a judgment of a trial court, events transpire which prevent the appellate court from granting any effectual relief. (*Consol. etc. Corp. v. United A. etc. Workers* (1946) 27 Cal.2d 859, 863 [167 P.2d 725].) ■ Lennane's challenges to the temporary custody orders attempt to dispute conditions of parenting time and visitation which are no longer in effect, having been superseded by the final judgment. Moreover, we cannot turn back the clock and restore the custody situation that existed before the orders were made. With the best interests of the child in mind (Fam. Code, § 3011), we cannot undo bonds that were formed or stability that was created by the temporary orders. We therefore conclude any error in the temporary orders would ordinarily be, at this point, moot.

So far as Lennane contends that the temporary orders caused him irreparable harm in the later course of the litigation by creating an unjust status quo which the trial court felt bound to preserve, we note that the normal remedy where a party fears irreparable harm from an interlocutory order is writ review, a remedy Lennane failed to pursue in this case. (See 8 Witkin, Cal. Procedure, *supra*, Extraordinary Writs, § 62, pp. 840-841.) And, as we have explained, that is also the remedy which law and policy compel as to temporary custody orders.

Although any error in the temporary orders would ordinarily be moot, nevertheless, we shall discuss the merits of his challenges to the orders, for one reason only. As indicated above, Lennane asserts that the adverse rulings he complains of sprang from the gender bias of a sitting judge, the Honorable Charles Kobayashi. It would be a disservice to the parties, the accused judge, and the family law system of this county if we declined to air and resolve this grave charge.

B. *Lennane's claims of gender bias.*

At the outset, we make two observations about this claim of judicial gender bias, advanced in this child custody dispute.

On the one hand, judicial gender bias is expressly outlawed by the Legislature (Fam. Code, § 3040, subd. (a)(1)) and may subject a judge to discipline by the Commission on Judicial Performance. (See Rothman, Cal. Judicial Conduct Handbook (1999) Judicial Behavior and Implications, § 2.11, pp. 37-39.) The prohibition on judicial gender bias therefore reflects important societal policies of fairness in our judicial system.

On the other hand, claims of judicial gender bias are easily made in child custody disputes between biological parents and involving infant children. This is so because biological parents are, by reason of nature, of different sexes, and because custody orders involving infants invariably designate one parent as the primary custodial parent, with rights of visitation to the other. Consequently, nearly every custody order involving an infant child will appear on its face to favor one sex or the other, i.e., the parent who is the primary custodial parent.

It is with these preliminary thoughts in mind that we turn to Lennane's claims of gender bias.

In enacting former Civil Code section 4600, subdivision (b)(1) (reenacted without substantive change in the Family Code as § 3040, subd. (a)(1)), the Legislature implicitly recognized the historic tendency of family courts to decide custody matters based on gender and expressly barred those courts from doing so henceforth: "In making an order granting custody to either parent, the court . . . shall not prefer a parent as custodian because of that parent's sex." Lennane contends that Judge Kobayashi violated this statutory mandate in making both of the temporary custody orders at issue. However, he does not base his charge of gender bias only on the orders themselves. Rather, he argues that the judge's entire course of conduct throughout the time he presided over the case reveals the bias which the orders embody.

To assess Lennane's contention, we must recount the procedural history of the case in greater detail than we have done so far. We address matters relevant to each temporary custody order under the case number of Lennane's purported appeal from that order.

*Case No. C030662*

As will appear, Lennane did not wait to start talking about gender bias until after Judge Kobayashi ruled against him. From the very beginning of the case, even before the child was born, Lennane suggested that rulings unfavorable to him would betray such bias.

*The proceedings in May 1998.*

In Lennane's first pleading, filed on May 12, 1998, in response to Lester's custody motion—months before the expected birth of the parties' child—he

requested the immediate commencement of a section 730 evaluation of the parties' parental fitness. However, he cited no authority holding that it is proper or even permissible to do such an evaluation when the child who may eventually be the subject of a custody determination has not yet been born. Instead, he cited the equal protection clause of the United States Constitution and an anti-gender-bias provision in the California Standards of Judicial Administration, then discussed the law's adoption of gender neutrality in custody cases, then ominously referred to "studies on gender bias in the courts [which] have shown that some judges still tend to harbor a bias in favor of mother[s] when custody of small children are [*sic*] in issue," and finally warned "the judiciary" to "be vigilant in its efforts to insure that its decisions do not reflect unquestioned assumptions and unconscious biases." In short, rather than justify the unusual relief he sought with any sustained legal argument, Lennane prepared the court in advance for a charge of gender bias if any ruling went against him.[17]

Furthermore, Lennane really sought far more than the mere commencement of a section 730 evaluation. His true demand, openly professed in his attached declaration, was that the court immediately award him sole physical custody in Florida—apparently regardless of what the evaluator might find: "I cannot . . . uproot my family. *The court will have to make the decision whether this child will reside with me in Florida or with the Plaintiff here in California. This decision must be made prior to the birth of the child . . . .*" (Italics added.)[18]

In light of Lennane's submissions to the court (and his counsel's manner of urging his claims at the subsequent hearings, as we discuss below), it is not surprising that Judge Kobayashi displayed some skepticism toward Lennane's claims. As we shall show, this does not tend to prove that the judge ruled based on gender bias.

At the hearing of May 20, 1998, on the parties' motions, Judge Kobayashi made the following remarks and rulings which Lennane cites as collective evidence of gender bias: 1. The judge declined to make any order on custody or to order the commencement of a section 730 evaluation before the child's birth. 2. The judge said he would not award custody based on who was a

---

[17]Judge Kobayashi took note of this tactic at the first hearing: "I notice in your papers, you're saying, the Court may be gender-biased in certain [*sic*]—I'm not."

[18]True, Lennane added that to bring this result about "it is imperative that a custody evaluation be performed commencing immediately." But he did not say that the court could properly defer its award until after the evaluation was done if it should happen to be unfinished when the child was born. Nor did he say that he would accept the court's decision to adopt any recommendation by the evaluator other than an award of sole physical custody to himself.

better parent. 3. The judge said: "[T]he mother may be just as capable a parent as anybody else and she's the birth mother." 4. The judge said: "[H]e can stay here and parent the child with the mother if he wants to. He could move here. He's the one that came to Sacramento and impregnated this woman who now has—is going to bear the child. He could come to Sacramento and parent the child. [¶] . . . [¶] If you want to decide the issue of whether she should be better [*sic*] or he should have custody, we could do it here in Sacramento. If he wants to stay in Sacramento, I'd be willing to do that. But if he's going to Florida, I'm not going to do it." 5. The judge said: "Presumably, the child will stay here with the mother, and he could come here. And then we could litigate the—he could stay here for six months. He can afford it. He could stay here for six months, and we can go through a 730 evaluation at that time if he's still interested in having custody of the child. But I'm not going to do it on the basis of the father living in Florida and the mother living here *and the child is—as she indicates, the child is to be breast-fed by her.*"

*Analysis.*

Lennane characterizes these remarks and rulings thus: "Despite the fact that both parties had requested pre-birth custody orders, at the May 20 hearing the court deferred all custody issues until after the birth of the child, and then placed the burden on Father to move to Sacramento and prove that 'he's still interested in having custody of the child.' . . . In response to Father's request for mediation or commencement of a custody evaluation which would provide the basis for a reasoned temporary custody order at the time of the child's birth, the court expressed only contempt and impatience. The court was instead content to rely on its presumption that the baby would remain with Mother, who 'may be just as capable a parent as anybody else and she's the birth mother.' . . . By requiring Father to move to Sacramento for six months before the court would even consider his request for custody (which Father did), the court treated Father like a second-class citizen."

This characterization ignores critical facts about both the context and the content of Judge Kobayashi's decisionmaking at the May 20 hearing.

First, as Lennane admits, *both parties* sought prebirth custody orders, and Judge Kobayashi denied that relief to both. His refusal to award Lester custody before the child's birth is hard to square with Lennane's charge that the judge favored Lester because of her gender. The judge's presumption that Lester would have physical custody of her daughter immediately after birth stemmed from two simple facts: 1. Lester intended to breast-feed her

daughter,[19] and 2. The only alternative Lennane had yet proposed would have required transporting a newborn baby cross-country. Neither of these considerations evidences gender bias.

Second, Judge Kobayashi "placed the burden" on Lennane to come to Sacramento to pursue his claim only after Lennane's counsel insisted, in keeping with Lennane's declaration, that the judge decide then and there not only which parent should receive custody upon the child's birth, but in which state. Lennane was obviously the party more easily able to relocate temporarily, and the only one with ties to the other's state of residence. The judge's finding that the party with these attributes should relocate for purposes of the custody dispute, thus making himself readily available to the court and to any mediator or evaluator the court might appoint, had nothing to do with gender.

Finally, Judge Kobayashi's statement that he would not award custody based on "who [was] the better parent" had two gender-neutral purposes: to point out that the correct legal standard for deciding custody is the best interests of the child, and to explain why he would not order a prebirth section 730 evaluation. As the judge put it: "The child isn't even born yet and you're asking . . . the Court to make a predetermination as to whether . . . a child's better off with the father or mother. [¶] Plus one thing, she's the mother of another child. He's the father of three or four other children. Presumably, they both raise their children properly, or whatever. I mean, we're not going to do it on the basis of who's a better parent. We're going to do it on the basis of what's better for the child."

*Subsequent proceedings leading up to the first temporary custody order.*

Between the May 20 hearing and the next hearing, on July 22, which gave rise to the first temporary custody order challenged by Lennane, the parties' child was born. Following Ava's birth on July 12, as we have recounted above, Lennane moved ex parte for joint legal and physical custody, proposing a temporary custody order giving him up to 12 hours a day of parenting once Ava was released from the hospital and advocating a bird nesting arrangement in which the parents would obtain a residence for Ava at which to share parenting while living elsewhere. Lester opposed the shared custody and bird nesting proposals and requested primary physical custody because she intended to breast-feed Ava. Mediator Carol Greenfield, after meeting

---

[19]The judge said to Lennane's counsel: "Is your client going to breast-feed the child in Florida?" Presumably this is an instance of what Lennane refers to as "contempt and impatience" toward him. In fact, this comment shows that recognizing a relevant biological difference between the sexes does not evince gender bias.

with the parties several times, recommended a short-term visitation arrangement of one hour a day for Lennane.

At the July 22 hearing, Judge Kobayashi made the first of the temporary custody orders that Lennane challenges, maintaining Lester's physical custody and adopting Greenfield's one-hour-a-day visitation proposal. As we have noted, the judge also ordered a section 730 evaluation over Lester's objection.

Lennane blames gender bias for that part of the July 22 order which went against him. In his view, there could be no other reason for awarding Lester 23/24ths of the available parenting time even temporarily, or for rejecting his bird nesting scheme. Furthermore, he asserts, this order, along with the later temporary custody order he complains of, irrevocably damaged his chances for permanent physical custody by creating an invidious status quo which the court would feel obliged to maintain on grounds of "stability." (See pt. IV, *post.*)

As with the May hearing, close scrutiny of the facts and circumstances underlying the July 22 order leads us to reject Lennane's claim of gender bias. Faced with an unusual and ever more acrimonious relationship between the parents of a prematurely born and still fragile infant, Judge Kobayashi sought a temporary solution that would serve Ava's best interests while keeping the peace between the parties so far as possible. As we shall explain, even if not ideal, the judge's solution did not discriminate against Lennane because of his gender.

In support of Lennane's application for an order to show cause, filed on July 14, 1998, Lennane declared that Lester deliberately failed to inform him of the child's impending birth, delayed mediation, and continued to deny him access to the child; he also noted that he had proposed a bird nesting arrangement before the child was born and that Lester had refused it. Lester declared in response: Lennane pressured her to agree to mediation before the child's birth even though she was "extremely upset, fearful [of] and intimidated" by him; she had nevertheless engaged in mediation (even if not all he wanted); he could not be reached when she was in labor; his bird nesting proposal was unfeasible because she had another daughter to care for; when the baby was still in the nursery he demanded that Lester sign a release to permit his wife (whom Lester did not know) to visit, and when she refused he pressured hospital staff into denying her permission to let her daughter visit the baby.

Lennane then submitted the declaration of Frank Dougherty, Ph.D., a forensic psychologist, in support of the bird nesting scheme. Dr. Dougherty

stated that his opinion was based on his experience in child custody matters, his expertise in child development, and his review of mediator Greenfield's report and recommendation. He did not state that he had met or observed the parties or their daughter. Nor did his declaration mention any specific facts about the case other than Ava's age and the name of Lennane's counsel.

Lennane also submitted a new declaration denying all of Lester's charges against him, accusing Lester of negligently harming Ava and placing her at risk, and averring that mediator Greenfield had refused to follow the law in her recommendations to the court.

At the July 22 hearing, Judge Kobayashi initially stated it was premature to argue the matter because he had not yet seen Greenfield's report and the parties were scheduled to go back to mediation in a few days. He added: "I'm no expert on this area. I . . . have to depend on expert testimony to decide in each particular case what is in the best interests of the child. [¶] And there is no—I mean, I've read books. Some book says A and other books say B and some say C. I really don't know what's best under these circumstances. I need some expert testimony, expert input from other parties. And, obviously, Ms. Greenfield's one of them. [¶] And if your client disagrees with this, Ms. Borack [Lennane's counsel], I'm going to need some . . . additional input from other people." Lennane's counsel cited the declaration of Dr. Dougherty. Lester's counsel objected to it as hearsay, and the judge agreed.

Lennane's counsel asserted: "When we were last in court, the Court said show me you care. Come here to California. Make yourself available to parent this child. He does that, and now the Court tells him it doesn't make any difference." Judge Kobayashi interrupted:

"Excuse me. Excuse me. I'm not going to listen to this anymore because that's a very, very unfair statement that you're making about this Court. If you want to submit a declaration, that's fine.

"But you know and I know and everybody else in this world knows that . . . the parenting of an infant is a very, very delicate matter. And just because your client came 3,000 miles over here . . . does not mean that he is entitled automatically . . . to 50-50 or whatever it is that your client is asking for.

". . . [A]nybody knows that we need experts. And this is the reason we agreed to send this matter to Carol Greenfield. This is the person you've all agreed upon. And this is the recommendation that Carol Greenfield came up with.

"I'm not going to sit here and listen to that, Ms. Borack. . . . I know something about deadbeat dads. I see them in court all the time. . . . I also see hundreds of other fathers who are very caring. And that's fine.

"I've been in the forefront as far as trying to . . . get parenting time for the fathers just as much as for the mother. . . . I am in favor of the father having equal rights with the mother as far as the child is concerned. But you have to consider everything in the context of the case.

"And in this particular case, we're talking about an infant that, apparently, was in an incubator for five days and probably was born prematurely and has other difficulties and, apparently, is also breast-feeding.

"I am definitely not an expert in this area, and I'm not going to endanger the life of this child by saying father has to have 50-50 or the mother has to have 50-50 or 75. I'm not going to do that. In fact, this is . . . why we have experts in this area.

"If I were an expert in this area, I'd tell you what to do right now, but I'm not. I need expert testimony. I am not going to read books. I'm not going to read handwritten declarations by any experts in this area because we can get experts to say anything an expert wants.

"I mean, I could pay an expert and have an expert say anything that . . . I ask the expert to do. We know that experts are paid often to say things that they . . . do not necessarily mean, but they prostitute the whole system. I'm not saying this person did, but I'm not going to do it. I'm not going to listen to that.

"I suggest that . . . you go back to Carol Greenfield because that's the person you agreed upon. This isn't somebody that I foisted upon you. . . .

"[B]ut if you disagree with Carol Greenfield, you're going to have to get some live testimony and go from there.

"If you want me to set this for long cause, I'll set this for long cause. But I'm not going to make any decisions based on . . . oral arguments of the attorneys. I mean, we have to look out for what's best for this child.

"I agree, all child [*sic*] need equal—I mean, access to both parents in order for the child to bond with both parents. But I'm not the one that says a child has to bond 24 hours a day or 18 hours a day with each parent before a bonding can take place.

"So it doesn't do any good to argue with the Court about it because the Court can't do anything, and the Court certainly is not going to do anything between now and Monday especially on this case when you're going back to mediation. I mean, that's the reason why we have mediation, for the parties to try to work these things out equally.

"And as Greenfield says, both parents . . . are equally interested in . . . the raising of this child. And they both . . . want to have as much contact as possible.

"Knowing that this expert said in this particular case that parenting time should be one hour a day, maybe that's not reasonable, but at least that's what one expert says.

"If you have another expert that says otherwise under these circumstances, fine, I'd be willing to listen to that. . . . [B]ut we've got to do this in a manner of a trial with live witnesses, not on the basis of declarations."

Lennane's counsel insisted that the judge had to make a pendente lite order then and there. Judge Kobayashi replied: "[J]ust to save everybody time, I'm going to adopt Carol Greenfield's report as an interim pendente lite order. And . . . I'm sure this order's not going to be in effect for a very long period of time because you're going back for further mediation . . . on July 27th."

Lester's counsel argued for attorney fees and costs pursuant to a prior motion, then demanded a pendente lite order on child support. She suggested $10,000 a month based on Lennane's income and the guidelines. Judge Kobayashi was skeptical: "But 10,000 is obviously not necessary for this child right now based on her lifestyle. I mean, she [Lester] only met him one day and that was the end of it—or two days." However, he agreed to make a temporary order on support and attorney fees.[20]

Lennane's counsel then insisted that "due process" required giving her a further opportunity to present her client's case. Judge Kobayashi responded that this was a law and motion matter, not an occasion for prolonged argument.

Lennane's counsel requested the matter be set for trial in three months and renewed her request for a section 730 evaluation, to be completed in time for

[20]Like Judge Kobayashi's refusal to grant Lester's request for a prebirth custody order, this interchange demonstrates that the judge did not consistently lean toward Lester's position. So far as the judge displayed impatience (as Lennane asserts in charging gender bias), it was directed at both sides.

trial. She also renewed her request for an award of joint legal and physical custody to both parents. Finally, she requested an order for at least six hours a day of parenting time.

Judge Kobayashi took child support and attorney fees under submission and ordered the parties to submit letter briefs. He then ordered the section 730 evaluation "because if I don't order this today, it will never go away. [¶] I don't . . . necessarily think . . . it's imperative, . . . [¶] but I'm going to do it because . . . this issue's going to be here forever."[21] Lester's counsel objected to the latter order.

Finally, Judge Kobayashi adopted Greenfield's report, which he had received since the start of proceedings, as an interim order. (This is the part of the court's order from which Lennane purports to appeal.)

*Analysis.*

Lennane asserts that Judge Kobayashi's order violated Family Code section 3040, subdivision (a)(1) "as a matter of law" because it gave Lennane only 1/24th the amount of parenting time that Lester received. However, Lennane cites no authority for the proposition that a family court unlawfully "prefer[s] a parent as custodian because of that parent's sex" merely by making a temporary custody order that does not give the other parent equal time. Nor does he tell us how much time a judge must give each parent to avoid imputations of gender bias. He merely says vaguely that the judge here should have "exercise[d] [his] discretion to render a more gender-neutral and less arbitrary order." For want of developed argument or authority, the claim that the order violated the statute as a matter of law is waived. (*People v. Turner* (1994) 8 Cal.4th 137, 214, fn. 19 [32 Cal.Rptr.2d 762, 878 P.2d 521]; *Amato v. Mercury Casualty Co.* (1993) 18 Cal.App.4th 1784, 1794 [23 Cal.Rptr.2d 73].)

Lennane also claims, however, that awarding him only one hour a day (which was the recommendation of mediator Carol Greenfield) revealed the judge's gender bias under the circumstances of this case. We cannot agree. This claim depends on a selective, out-of-context reading of the record. Furthermore, it ignores a key point: the judge made this order only because Lennane insisted an order had to be made immediately, and Lennane proffered no good evidence to support any other order.

Lennane asserts that adopting Greenfield's recommendation as a temporary custody order was "biased, or arbitrary, or both" for several reasons: (1)

---

[21]The judge did not name the evaluator at this time, but asked the parties to submit names. The record does not reveal why the judge selected Dr. Susan Fossum as evaluator.

Greenfield had seen the parties only twice in voluntary, confidential sessions before Ava was born; (2) the judge said at the outset that he did not have "enough information to decide whether Carol Greenfield's recommendation [is] right"; (3) the judge said of her recommendation "maybe that's not reasonable," yet adopted it anyway; and (4) the judge had not seen the report when the hearing started, Lester had not referenced it in her pleadings, and Greenfield was not at the hearing. We are not persuaded.

First, the fact that Greenfield had seen the parties twice put her well ahead of Lennane's purported expert, Dr. Dougherty, who had not seen them at all—and who also did not attend the hearing.

Second, the judge's brief comments quoted by Lennane must be read in the context of his full remarks at the hearing. In that context it is clear that the judge considered Greenfield's recommendation presumptively reliable absent strong evidence to the contrary.

Third, there was no evidence before the judge that Greenfield's recommendation was wrong. Dougherty's declaration, which was all that Lennane proffered (aside from his own self-serving declarations), ruminated abstractly on the theoretical advantages of bird nesting but made no reference to the facts of the case. Dougherty did not even respond to Lester's facially plausible reason for rejecting bird nesting—that it could not work because she had another daughter to take care of.[22] The judge repeatedly said he would consider live expert testimony, but Lennane had none to offer.

Lennane asserts: "Judge Kobayashi attempted to rationalize his ruling by noting at the hearing that Mother was breast-feeding." He then asserts that limiting his time to one hour per day "bears no rational relationship" to this fact. But Lennane ignores the judge's observations about this child: she was not only newborn, but premature and in fragile health. Thus it was reasonable to conclude that the child's best interests would be served—in the very short time before the parties returned to mediation—by maintaining custody with the parent who was breast-feeding the child and by limiting the disruption of the child's life as much as possible. Even if the judge might reasonably have given Lennane more visitation time (despite the lack of evidence justifying such an order), his failure to do so does not prove gender bias.

---

[22]Lennane makes no articulated argument that the judge erred by refusing to consider the Dougherty declaration. Thus any claim that the judge erred in this respect is waived. (*People v. Turner, supra*, 8 Cal.4th at p. 214, fn. 19.)

*Case No. C031941*

*Events leading up to the second challenged order.*

After the temporary custody order in case No. C030662, the parties continued mediation and two further temporary orders were issued—both increasing Lennane's visitation time, one over Lester's opposition.

Subsequent to July 27, 1998, mediator Greenfield filed an interim report stating that the parties had stipulated to a new schedule which increased Lennane's parenting time to two hours a day three days a week with the option of an additional hour a day on the other days of the week.

On September 15, Judge Kobayashi entered an "order on submitted matters, child support[,] attorney's fees and costs, designation of an Evidence Code section 730 evaluator," which formalized a handwritten order dated August 6. Lennane adduces several of Judge Kobayashi's findings in the September 15 order as proof of gender bias. We therefore quote a substantial portion of the order, italicizing the findings Lennane cites.

After reciting that the court adopted Greenfield's July 19 report as an order, awarded the parties joint legal and physical custody, and ordered them to submit to the section 730 evaluation, Judge Kobayashi found in part:

". . . This is really a simple paternity case where both parties state the Plaintiff . . . is the mother and the Defendant . . . is the father of the child, and where both parties want to be equally involved in the rearing of the child.

". . . *But because of the father*[']*s (who resides in Florida) incessant and increasing demand for equal parenting time of a child who was conceived as a result of the proverbial one or two night stand,* and because of mother's demands for huge amounts of money for child support, the parties and their counsel have proceeded on a course of litigation without regard for the consequences that may befall upon [*sic*] the child.

". . . Both parties clearly have lost sight of what is in the best interest of their one month old child and instead have set dead aim on trying to prove and/or disprove that father should have a proscribed [*sic*] amount of parenting time irrespective of the child's age and condition and that mother should have an inordinate amount of money to support her one month old child.

". . . *This Court does not need to be inundated with case and statutory authority that father is legally (as opposed to what is in the child's best*

*interest) entitled to 50/50 custodial time irrespective of the child's age, physical condition, etc.,* or that mother is entitled to an existence equivalent to that of Ivana Trump at father[']s expense because of her having giv[en] birth to Ava.

". . . Both parties are overlitigating this case.

". . . If the parties are intent on waging this skirmish to the extent it is [*sic*] now doing, this Court can not imagine how psychologically and emotionally damaging to father, mother and Ava will be the battles over the ensuing eighteen years. [¶] . . . [¶]

". . . [N]o expert can opine with any degree of certainty as to the amount of time a one month old or a four month old child should spend with each parent.

". . . However, it is clear that under the circumstances of this case with the resources available to father, he can spend a considerable amount of time with the child in Sacramento.

". . . At the same time, this Court will not authorize a wet nurse or any travel outside Sacramento for the time being.

". . . It can not be undisputed [*sic*] that this child incurs a high risk of illness or injury by any travel outside Sacramento. . . . Plus an unwarranted separation from mother.

". . . These circumstances far outweigh the need for father and his family to see the child outside of Sacramento in the near future. [¶] . . . [¶]

". . . At this point in Ava's life just a month old, it would be difficult to measure her needs based on lifestyles.

". . . However, mother's declaration with respect to the needs of the child is pure speculation right now.

". . . In fact, *because father is very willing and desirous of taking on more than one-half the parenting duties, and if mother can not perform all of the functions normally associated with the mother but wishes to have a third person perform them, then father should be allowed to do so provided that the child development experts opine that it would be appropriate for father to do so.*

". . . In that event, a great deal of the expenses estimated by mother may not be necessary . . . . [¶] . . . [¶]

". . . The parties do not have to litigate another issue in an already overlitigated case." (Italics added.)

Shortly before Judge Kobayashi entered this order, Greenfield filed another interim report noting that the parties were now under court order to provide Lennane two hours a day of parenting time three days a week and the option of one hour a day on the other four days, and that Lennane had requested a further increase in parenting time to which Lester did not agree. Greenfield recommended giving Lennane one hour a day for two days a week in addition to the three days a week he already had.

Lennane moved for an ex parte hearing on Greenfield's recommendation. Lester opposed the motion and proposed an alternative change in visitation.

In declarations, the parties exchanged new charges. Lennane declared that Lester had hostile male guests at her home when he arrived for his parenting time, that she took Ava out of the house for too long, and that in defiance of a court order she refused to let him bring a friend into the house. Lester declared that Lennane brought strangers into her home to take photographs, abused and threatened her at mediations, attacked Greenfield professionally and personally, and said he would get the Legislature to change the laws in this field.

Judge Kobayashi heard Lennane's motion on September 15 and 21, 1998, and granted it. Nevertheless, Lennane finds yet more proof of gender bias in the judge's comments on this motion. Therefore we must set out the proceedings on the motion in detail.

At the September 15 hearing, Judge Kobayashi decided that he needed to hear Greenfield's account of what had gone on in mediation before he could rule on Lennane's motion. (In passing, the judge said: "Well, we're just going to have to set this for a regular long cause hearing because I'm not going to hear this [on a short basis] just because these people have a lot of money.") He refused to accept Lester's counsel's characterization of the mediation: "Either you're exaggerating or somebody else is exaggerating. . . . [¶] Let's hear from Ms. Greenfield herself . . . whether this is a brawl, whether this is something that's being imagined by [Lester] or exaggerated by her."

When the section 730 evaluation was brought up, the judge asked: "Now, I have a question. What is this 730 going to accomplish? I'm . . . a little

confused. I know I approved it.[23] But what is the 730 going to accomplish?" After several pages of colloquy with Lennane's counsel, the judge said: "[T]he Court really needs an offer of proof as to what this 730 is going to prove instead of wasting thousands and thousands of dollars and time with a psychologist. . . . [¶] [T]he idea of a psych eval is to determine the ability of the parent to . . . relate with the child or do things with the child, not with each other. Each other is co-parenting issues. We're not . . . having Dr. Fossum determine the co-parenting issues. [¶] So . . . we're saying that Dr. Fossum is going to be God and say, look, the mother's better or the father's better based on some psychological exams, some testing[?]"

At the September 21 hearing, Greenfield testified that the mediation sessions had not been a "brawl" (Lester's counsel's term), though there had been "emotionality on both sides." Lennane had once called Lester a "bitch" and accused her of "pregnancy for profit." On one occasion Lennane had become angry and raised his voice and had to be taken outside to calm down. However, Greenfield never felt endangered or intimidated by him, nor did Lennane ever threaten in her presence to take action against her license. She agreed, though, that he had accused her of gender bias and of failing to uphold the law on equal parenting in her recommendations, and that he had said he had the power to get the Legislature to change the law.

According to Greenfield, the parents clashed mainly because Lennane kept pushing for changes in the agreed orders, while Lester did not want to have to renegotiate everything every time. Lester was more accommodating at first, but her attitude changed in part because Lennane was so assertive and in part because she learned he had put her under surveillance, which angered her and made her feel her privacy was being invaded.

Greenfield added that so far as the child was concerned, any of the proposals on the table for shared custody and visitation would be acceptable.

Judge Kobayashi asked about Lennane's surveillance of Lester. Greenfield replied that he had admitted hiring someone to keep an eye on Lester's whereabouts.

After counsel argued, Judge Kobayashi adopted Greenfield's recommendation as Lennane had asked. However, he had some stern remarks for both sides. On the one hand, he summarily rejected Lester's complaints about Lennane's "attacks" during mediation and her proposal to end court-ordered joint mediation sessions. On the other hand, he warned that any further

---

[23]As noted above, the judge approved the evaluation previously only because he felt that "[I]f I don't order this today, it will never go away."

surveillance or intrusion into Lester's privacy by Lennane would be dealt with severely, including sanctions. (The court's subsequent order after hearing repeated this warning.) The judge was also troubled by Lennane's accusation that Greenfield was not following the law, which is not meant to control mediation proceedings; the judge said he would terminate the mediation if he heard about anything more like that.

*The temporary custody order of November 13, 1998.*

On November 3, 1998, Dr. Fossum filed her section 730 evaluation, which recommended the award of physical custody to Lennane. On November 12, Greenfield filed a new report recommending that Lennane receive equal parenting time. The parties filed competing proposals for ultimate custody and visitation arrangements.

Judge Kobayashi conducted a hearing on November 13, 1998, on the issue of an interim pretrial parenting plan. The main focus of the hearing was Greenfield's testimony as to her recommendation. (We discuss this testimony, *post.*)

At the end of the hearing, Judge Kobayashi said: "I'm very troubled by this whole case and, especially, by what's been happening." He rejected Lester's interim parenting plan: "I think we all agree that the father has to have more continual contact." Then he also rejected Greenfield's proposal, supported by Lennane: "Ms. Greenfield's recommendations, however, are substantially different from . . . her most recent recommendations. And I have some difficulty accepting her recommendations . . . that the father see the child every day in light of what's happened up to now. [¶] [I]t's also clear there is no definitive evidence as to what amount of time for the father in this particular case would be in the child's best interests. [¶] . . . I don't think there's been enough evidence. Ms. Greenfield referred to some literature, but we don't know what the literature is. [¶] And, Ms. Borack, you referred to literature. I don't know what literature you're talking about."

Finally, the judge made an order for interim parenting which fell between the parties' recommendations: one weekend overnight for Lennane, plus five hours a day on Monday and eight hours a day on Wednesday and Friday. The judge subsequently entered a minute order to that effect, from which Lennane purports to appeal.

*Later pertinent events.*

On November 20, 1998, Lester filed a motion to subject Lennane and his wife to examination by Lester's expert pursuant to Code of Civil Procedure

section 2032 or to appoint a new section 730 evaluator, and for attorney fees and costs for the motion. Lennane opposed the motion. On December 7, after a hearing, of which the transcript has not been included in the record on appeal (except for excerpts attached to Lennane's subsequent disqualification motion), Judge Kobayashi denied the motion without prejudice.

On December 21, Lennane filed a motion to disqualify Judge Kobayashi from hearing any further matters in the case on grounds of personal prejudice and bias. (Code Civ. Proc., §§ 170.1, 170.3.) Though the motion alleged several different forms of bias, including a bias against Lennane's wealth, it mainly alleged gender bias.

Also on December 21, Judge Kobayashi issued an order on various matters.[24] It includes the following statements:

"[I]t is undisputed that the need for weekly mediation arose from [Lennane]'s insistence that he be entitled to more than the standard, classic and well-established criterion of short but frequent visits with newly born infants. [Lennane] could have availed himself of Family Court services and avoided all of the expenses of which he now complains. The court did not order private mediation against [Lennane]'s will!

". . . The child support of $4,000 per month is a paltry sum in comparison with the amount [Lennane] is spending each month in supporting himself and his family in Florida. The child fathered by [Lennane] in this proceeding is living in virtual penury in comparison with [Lennane]. There is no reason for [Lennane] to complain about the cost of nurturing the product of his creation here in Sacramento while his intact family with his wife and child in Florida thrive in opulence.

". . . This court will not respond in kind to the intemperate, inflammatory and personal remarks directed at this court. Suffice it to say that as intelligent as [Lennane] is he does not seem to understand the concept of due process. Nor does [Lennane] seem to understand that it is this court that makes the ultimate decision in this case, not the 730 expert. . . ."

The order finally noted that the case was transferred to Judge Ohanesian "for all future proceedings from this point forward."

On December 29, Judge Kobayashi issued an order stating: "Although the issue is moot inasmuch as this judge had assigned the case to Judge

---

[24]Since this order does not mention Lennane's disqualification motion, we presume that it was prepared before the court received the motion.

Ohanesian for all purposes, this judge accepts the CCP 170.1 disqualification filed by the respondent."

*Analysis.*

So far as Lennane repeats matters from case No. C030662 in his argument as to case No. C031941, our prior analysis of those matters is sufficient. Therefore we now address only Judge Kobayashi's comments and rulings after the first temporary custody order.

Lennane points to a good deal of the material we have set out above as evidence of Judge Kobayashi's supposed gender bias in this phase of the proceedings. He also compares Judge Kobayashi's conduct to that of trial judges in two recent cases (neither of which is a child custody case) whose rulings were overturned on appeal for gender bias. (*Catchpole v. Brannon* (1995) 36 Cal.App.4th 237 [42 Cal.Rptr.2d 440] (*Catchpole*); *In re Marriage of Iverson* (1992) 11 Cal.App.4th 1495 [15 Cal.Rptr.2d 70] (*Iverson*).) As we shall demonstrate, Lennane's claims are meritless, and the conduct of the trial judges in *Catchpole* and *Iverson* (which we shall discuss in detail in a moment) bears no resemblance to that of Judge Kobayashi here.

Lennane cites "factors" identified in *Catchpole* and *Iverson* as tending to show judicial gender bias: language that betrays gender stereotyping, "disdain and impatience" toward the party who is the object of bias, and evidence of a "predetermined disposition" to rule against that party. (*Catchpole, supra*, 36 Cal.App.4th at pp. 247, 251, 253, 259; *Iverson, supra*, 11 Cal.App.4th at pp. 1498, 1500.) When embedded in rigorous analyses of the facts of particular cases, as they were in *Catchpole* and *Iverson*, these "factors" can be helpful; in the abstract, however, they are not. Only the first "factor" suggests gender bias in particular, and it is not enough by itself to prove the point. "Disdain and impatience," though regrettable in a judge, need not spring from gender bias (or any other kind). The last "factor" adds nothing, but simply defines bias. Moreover, these "factors" lend themselves to abuse through quotation out of context, as Lennane's argument demonstrates.

Lennane quotes the following comments from the order of September 15, 1998, to prove both Judge Kobayashi's "disdain and impatience" toward Lennane and the judge's "reliance on outmoded [gender] stereotypes" to Lennane's detriment: (1) the judge's reference to Lennane's "incessant and increasing demand for equal parenting time of a child who was conceived as a result of the proverbial one or two night stand"; (2) the judge's statement that he did "not need to be inundated with case and statutory authority that

father is legally (as opposed to what is in the child's best interest) entitled to 50/50 custodial time irrespective of the child's age, physical condition, etc."; (3) the judge's statement that "if mother can not perform all of the functions normally associated with the mother but wishes to have a third person perform them, then father should be allowed to do so provided that the child development experts opine that it would be appropriate for father to do so." We are not persuaded.

First, this order substantially favored Lennane: it awarded him the joint physical custody and the section 730 evaluation he had requested and Lester had opposed, and it required him to pay only $4,000 a month in pendente lite child support rather than the $10,000 a month Lester had asked for. Second, each of the first two passages Lennane quotes is followed by equally strong language aimed at Lester which Lennane does not quote: the judge first criticized Lester's "demands for huge amounts of money for child support," then her supposed belief that she was "entitled to an existence equivalent to Ivana Trump at father[']s expense because of her having given birth to Ava." Third, the judge was annoyed with Lennane's "incessant and increasing demands for equal parenting time" mainly because the mediator, whose expertise the judge relied on, had recommended far less parenting time for Lennane at that point.[25] Fourth, the judge's reference to "the functions normally associated with the mother" is too vague to invoke any particular gender stereotype; furthermore, the judge's finding that Lennane could equally well perform all of these "functions" rebuts any presumption of bias. Finally, all the quoted comments were made in the overarching context of the theme that both parents were "overlitigating" the case and potentially causing Ava great psychological harm.

It is clear from the entire order that the judge was troubled by the ever-increasing acrimony between the parties and hoped that strong language might focus them more clearly on Ava's best interest. None of this language proves gender bias, any more than does the content of the order.

Lennane also tries to prove gender bias from the judge's language and conduct at the September and November 1998 hearings. Again, he fails.

According to Lennane, the judge challenged Lennane's counsel to justify the section 730 evaluation which the judge himself had ordered; then, "when the evaluator recommended custody to [Lennane], *which was contrary to the court's predetermined disposition,* the court gave the recommendation no weight in determining an appropriate pretrial custody share and declared that

---

[25]The judge's reference to "the proverbial one or two night stand" does not show gender bias, since it implicates both parties equally.

he was 'very troubled by this whole case.'" (Italics added.) Lennane's "predetermined disposition" charge finds no support in the comments he cites.

It is true, as we have noted, that the judge asked Lennane's counsel what the section 730 evaluation was supposed to accomplish. But we see no inference of gender bias from this fact. It was reasonable for the judge to wonder about the value of assessing the parties' parental fitness in a case where the child would be only three months old when the study was completed.[26]

Furthermore, it is not true that the judge "gave the [evaluator's] recommendation no weight in determining an appropriate pretrial custody share . . . ." After questioning the mediator about her plan, which was based on the possibility that the judge would adopt the evaluator's recommendation, the judge split the difference between the parties' pretrial custody proposals. By giving Lennane significantly greater time than before, the judge was impliedly giving weight to the evaluator's recommendation and the mediator's plan based on it. He merely did not find that that recommendation tipped the scales completely in Lennane's favor.

Finally, the judge's admission that he was troubled about the case was consistent with the tenor of his comments from the beginning. As we have shown, the judge's disturbance arose from the conduct of both parties.

Lennane characterizes the judge's questioning of mediator Greenfield about her new plan favoring Lennane as an "attack[]" and as "hostile cross-examination." It was neither. The judge merely wanted to make sure that he understood what inspired this new plan, which varied so radically from Greenfield's prior proposals, and what authority supported it. He questioned her closely, and finally declined to adopt her plan, because she did not directly answer his first questions and never fully addressed his concerns.[27]

Greenfield testified that her recommendation—to give Lennane eight hours a day every day plus two overnights a week—was based on "the 50 percent possibility" that Lennane would ultimately receive custody as recommended by the section 730 evaluator, and the need to prepare the child

---

[26]As we have mentioned, the judge ordered the evaluation only because Lennane insisted on it and the judge felt the issue would "never go away" unless he made that order.

[27]Ironically, Lennane finds equal proof of the judge's gender bias in his acceptance of Greenfield's first interim custody plan and his rejection of her last plan. In reality, he accepted the first plan because no evidence was offered to rebut the presumption that it was reliable, and he rejected the last plan because Greenfield's own testimony rebutted that presumption.

for this possible outcome. In her view, the differences between Lennane's and Lester's interim proposals for parenting time had less to do with the child than with the parents' conflicts; the child could handle any of the proposed schedules.

Judge Kobayashi asked whether Greenfield would make such a recommendation in an ordinary situation involving a three-month-old child with parents in conflict; he impliedly distinguished such a situation from one "where one parent may have a huge amount of wealth and the other may not . . . ." Greenfield answered that she had worked with a family with separated parents working different shifts, who each had the child 12 hours a day; however, she did not respond to the judge's point about financial disparities. The judge then reiterated his point about parents "not with the same financial resources."[28] He added: "[E]very lecture that I've gone to, every seminar I've gone to, and every literature [*sic*] that I've been reading indicates that infants under one year old should not be separated from one parent for a long period of time, especially overnights; whereas, you're recommending something quite contrary to that type of professional literature. And that's why I'm a little confused."[29] Greenfield answered: (1) these parents were not so intensely conflicted as others she had worked with, and (2) it often happens today that both parents work and infants go into day care at six or eight weeks old.

The judge then asked how Greenfield could justify such "a drastic change" from Lennane's current parenting schedule. Greenfield answered that she knew there was a trial coming up and she "thought that Ava needed to be prepared for a possibility" (i.e., Lennane's receiving custody). The

---

[28]Lennane asserts that the judge "repeatedly insinuated to Greenfield that her recommendation was somehow influenced by [Lennane]'s wealth and then ignored Greenfield's answers to the contrary." But Greenfield gave no "answers to the contrary": she never addressed the judge's concerns about the influence (if any) of the parties' financial disparity on her thinking. Furthermore, Lennane does not mention the judge's alleged bias against wealth in any argument heading in his briefs. Therefore, to the extent he purports to make a separate argument that the judge displayed such a bias, the point is waived. (Cal. Rules of Court, rule 15(a); *Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830-1831, fn. 4 [41 Cal.Rptr.2d 263].)

[29]According to Lennane, this question shows that the judge was improperly investigating the factual issues in the case in order to justify his preconceived bias, as the trial judge was found to have done in *Catchpole, supra,* 36 Cal.App.4th 237. The point is not well taken.

In *Catchpole* the trial judge challenged the testimony of the prosecutrix in a sexual harassment case by taking judicial notice that the weather on a key date in the case did not correspond to her description. No evidence of which the judge could properly have taken judicial notice on that point had been offered. Therefore he could have learned about the weather on that date only through personal investigation. (*Catchpole, supra,* 36 Cal.App.4th at p. 259, fn. 9.) Here, Judge Kobayashi merely cited general background information, not obtained at any specified time and not tied to the facts of the case.

judge asked whether that "possibility" would necessarily mean that Greenfield's proposed schedule was in Ava's best interest. Greenfield replied: "If there's a 50 percent possibility that [Ava] would be with her father as the primary residence, then it seemed to me that there needed to be some preparation, should that occur . . . ."

The judge asked: "Okay. But how do you know that there's even a 50 percent possibility that this is going to occur?" Greenfield said: "I—I guess I made a presumption. . . ." The judge asked whether Greenfield was "somehow swayed by the tenor of" the section 730 evaluation in making her proposal. Greenfield replied that it was not the "tenor" of the report that concerned her, but only the possibility that the court would adopt its recommendation.

The judge followed up: "[I]f . . . the judge or somebody says, well, it looks like there's going to be a 60 percent chance that the child will be going with the father rather than the mother, under comparable circumstances, but the father, say, lives in Sacramento and mother lives in Sacramento, would you still make the same type of recommendation?" Greenfield said not necessarily, "because we could work out something different." The judge then asked: "So when you say it will be in the child's best interests, you're really talking it would be in the child's best interests in the future, not necessarily what it will be today?" Greenfield agreed that that was her ultimate consideration, but added that "in the short run, I didn't think [the child would] be harmed by it." The judge asked: "Okay. You didn't think she'd be harmed by it, but it's not necessarily in her best interests; is that what you're saying?" Greenfield answered: "Well, I—what I said was that—your statement I had took [*sic*] to be valid, that in the—the mid- to long run, that if there's the possibility that she were to go to Florida, in the long run, this would be in her best interests."

Under further questioning by counsel, Greenfield testified that she thought there was literature supporting 50-50 parenting plans for infants, but could not cite any at the moment. Nor was she aware of any literature supporting such a plan where the parents reside 3,000 miles apart.

In summary, Greenfield failed to respond fully to the judge's questions, conceded that she could not say her plan was in Ava's best interest as of the hearing date, and admitted that she could cite no professional literature to justify the plan. Furthermore, even on her own understanding there was a 50 percent chance that Lennane would not get custody, which would deprive her plan of its only supposed justification.

Thus the judge's rejection of Greenfield's plan showed neither gender bias nor a predetermined disposition against Lennane. It showed only a proper

concern for Ava's best interest—which, in the judge's view, meant giving Lennane more parenting time than Lester wished, though not equal time as yet.

Lennane also asserts that in Judge Kobayashi's order of December 21, 1998, the judge "chastised [Lennane] for his 'insistence that he be entitled to more than the standard, classic and well-established criterion of short but frequent visits with newly born infants.'" Lennane says this language "might have been lifted from a case in the era of the 'tender years' doctrine" (the archaic presumption that the mother should get custody where a child is "of tender years"—cf. Civ. Code, former § 138). However, he cites no such case. Moreover, the language he quotes is gender-neutral—it would apply equally where a father had custody of a newborn infant. Finally, Lennane once more ignores context.

As noted above, the December 21 order largely concerned Lester's request for attorney fees and costs on her latest motion. In that context, the judge was explaining that Lennane could not reasonably object to paying costs his conduct had necessitated. As one example, the judge cited the fact that Lennane's demands for more and more parenting time from the beginning had required unusual and expensive private mediation. This is the point the judge was making in the paragraph of which Lennane quotes only part of a sentence.

Lennane finally claims that Judge Kobayashi admitted his gender bias when he accepted Lennane's motion to disqualify him. Citing no authority other than the disqualification statute, he asserts that the judge's "decision . . . to accept the disqualification constitutes a consent under Code of Civil Procedure [section] 170.3[, subdivision] (c)(3) *and a concession of his lack of impartiality*." (Italics added.) But, as the judge pointed out, the question was already moot because he had reassigned the case before receiving Lennane's motion. Furthermore, nothing in the judge's one-sentence order admitted the truth of any specific charge made by Lennane, let alone that of gender bias.

An examination of Lennane's main authorities—*Iverson, supra*, 11 Cal.App.4th 1495, and *Catchpole, supra*, 36 Cal.App.4th 237—will show how little Judge Kobayashi's conduct resembled that of the gender-biased judges in those cases.

In *Iverson*, the trial judge upheld a premarital agreement against the wife's attack, finding her story incredible. The judge said in part: "[T]he petitioner . . . , Cheryl Iverson, only had five or six luncheon dates with Chick Iverson before she decided to move into his home. Now, he sure as heck

does not look like John Wayne and he doesn't look like John Derek. And even if we take 17 years off him, I don't think he looks like Adonis. [¶] And, so, . . . we have a girl who . . . was lovely, . . . but . . . . [h]ad nothing going for her except for her physical attractiveness. Who, somehow or other, comes to the attention of Mr. Iverson and, after five or six luncheon dates, is invited to move into his home. [¶] . . . [¶] . . . [I]n light of the testimony that Mr. Iverson had come out of a very . . . unhappy marriage, his statement that he was reluctant to get married again adds some dimension here. . . . And, so, [he] decides that [living together rather than marriage is] the best thing for him. He makes an offer to petitioner, who thinks it's good. And then she moves in. [¶] I cannot accept the fact that, as she said, he was the one that proposed marriage to her. That would be the last thing that would be on his mind. And why, in heaven's name, do you buy the cow when you get the milk free, as we used to say. And, so, he's getting the milk free. And Cheryl is living with him in his home. [¶] And the impetus for marriage must be coming from her side, because there's nothing Mr. Iverson is going to get out of it. . . . He's got everything that he would want out of a relationship with none of the obligations. . . ." (*Iverson, supra,* 11 Cal.App.4th at pp. 1498-1499.)

The Court of Appeal reversed and remanded for retrial before a different judge because the trial judge's reasoning was "so replete with gender bias that we are forced to conclude Cheryl could not have received a fair trial." (*Iverson, supra*, 11 Cal.App.4th at p. 1497.) The court found overwhelming evidence that the judge "entertained preconceptions about the parties because of their gender" (*id.* at p. 1499): (1) The judge's characterization of Cheryl as a "lovely girl," with no corresponding label for her husband, suggested that "[t]he resolution of the credibility issues in the case . . . may have been based, at root, on Cheryl's gender and physical attributes." (*Ibid.*) (2) The word "lovely" in this context also gave off "more than a faint whiff of ' "romantic paternalism" ' . . ." (*Id.* at p. 1500.) (3) Calling a woman in her 40's a "girl" "seriously detracts from the *appearance* of justice." (*Ibid.*, original italics.) (4) Aside from terminology, the judge's reasoning was based on gender stereotypes: " '[L]ovely' women are the ones who ask wealthy men who do not look like 'Adonis' to marry, and therefore Cheryl was not credible when she testified Chick asked her to marry him." (*Ibid.*) (5) The judge's "reference to not buying the 'cow' when the 'milk is free' " contained "an obvious double standard based on stereotypical sex roles. (Both Chick and Cheryl were living together, but only Chick was seen as benefitting from the relationship, simply because he was a man.) And we hardly need elaborate that in the context in which it was used, the reference was plainly demeaning to Cheryl, analogizing her to a cow. Again we find a 'predetermined disposition' to rule against her based on her status as a woman." (*Id.* at pp. 1500-1501.)

In *Catchpole, supra,* 36 Cal.App.4th 237, a sexual harassment and assault case tried to the court, the trial judge rejected the female complainant's account as incredible. The Court of Appeal found "the strong impression of gender bias" based on (1) the judge's repeated expressions of "impatience, . . . which conveyed the sense he considered sexual harassment cases 'detrimental to everyone concerned' and a misuse of the judicial system," and (2) the judge's "stereotyped thinking about women and misconceptions of the social and economic realities many women confront," which gave rise to his finding that the complainant was not believable. (*Id.* at p. 249.)

As to the first point, the record showed that the judge questioned the plaintiff's motives for filing suit and her appreciation of the burden it placed on the defendants; warned her (alone among the witnesses) that her testimony would be "looked at very carefully"; exploded " 'Jesus Christ. [¶] . . . [T]here is a limited amount of judicial resource here' " when told that the plaintiff would put on 22 witnesses; derided the testimony of the plaintiff's expert witness on rape trauma syndrome; and generally referred to the case as "nonsense." (*Catchpole, supra,* 36 Cal.App.4th at pp. 249-253.)

As to the second point, the judge revealed in his questioning and his statement of tentative decision that he believed the plaintiff "was at fault for 'allowing' [the defendant]'s assault to occur because she placed herself at risk by agreeing to go to his house and did not more aggressively resist his advances." (*Catchpole, supra,* 36 Cal.App.4th at p. 253.) In doing so, the judge discounted undisputed evidence that the assault took place, inferred that the plaintiff invited or concurred in the defendant's advances even though the defense had never suggested that theory, ignored the plaintiff's corroborating evidence, and took judicial notice of purported facts adverse to her that neither side had proffered. (*Id.* at pp. 253-259 & fn. 9.)

This case could hardly be more different from *Iverson* or *Catchpole.* Unlike the trial judges in those cases, Judge Kobayashi made no credibility findings against either party because of gender stereotypes. His comments and rulings did not exclusively favor either party. Far from rejecting Lennane's custody claim out of hand, the judge gave Lennane every opportunity to produce supporting evidence for it. If the judge appeared skeptical of that claim from time to time, it was largely because—as the judge expressly found—both parents sometimes appeared to care more about prevailing over each other than about Ava's best interest.

*Conclusion*

For all the reasons we have stated above, Lennane's charge that Judge Kobayaski had a "predetermined disposition" to reject Lennane's custody

claim simply because Lennane was the father is untenable. Viewed in its entirety, the record shows that the judge's constant and overriding concern was for the best interests of the warring parties' infant child.

## III

### *The Permanent Custody Award*

In case No. C032406, Lennane challenges the order, made after trial, awarding primary physical custody of Ava to Lester.

"In making an order granting custody to either parent, the court shall consider, among other factors, which parent is more likely to allow the child frequent and continuing contact with the noncustodial parent . . . , and shall not prefer a parent as custodian because of that parent's sex. . . . [¶] . . . [¶] . . . This section establishes neither a preference nor a presumption for or against joint legal custody, joint physical custody, or sole custody, but allows the court and the family the widest discretion to choose a parenting plan that is in the best interest of the child." (Fam. Code, § 3040, subds. (a)(1), (b).)

In making an initial permanent custody determination, the trial court "must look to *all the circumstances* bearing on the best interest of the minor child. [Citation.] Family Code section 3011 lists specific factors, 'among others,' that the trial court must consider in determining the 'best interest' of the child in a proceeding to determine custody and visitation: '(a) The health, safety, and welfare of the child. [¶] (b) Any history of abuse by one parent against the child or against the other parent. . . . [¶] (c) The nature and amount of contact with both parents.' " (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 31-32 [51 Cal.Rptr.2d 444, 913 P.2d 473] (*Burgess*).)

"The standard of appellate review of custody and visitation orders is the deferential abuse of discretion test. [Citation.] The precise measure is whether the trial court could have reasonably concluded that the order in question advanced the 'best interest' of the child. We are required to uphold the ruling if it is correct on any basis, regardless of whether such basis was actually invoked. [Citation.]" (*Burgess, supra*, 13 Cal.4th at p. 32.)

Lennane offers a number of reasons why the trial court's award of primary physical custody to Lester was an abuse of discretion. We find none of them persuasive.

Lennane contends that the trial court's award was primarily based on preserving a status quo which was wrongly created by the earlier temporary

custody orders: it "builds on and continues orders which are the fruit of the poisonous tree of judicial gender bias." We disagree.

As we have explained, Lennane's charge of gender bias fails on the merits.

Lennane asserts that the trial court abused its discretion by finding that preservation of the status quo was in Ava's best interest; however, we do not agree.

To begin with, Lennane fails to recognize that in the procedural posture of this case the parties did not stand on an equal footing at trial: rather, he had the burden of showing good cause to disturb the status quo. *Burchard v. Garay* (1986) 42 Cal.3d 531 [229 Cal.Rptr. 800, 724 P.2d 486, 62 A.L.R.4th 237] (*Burchard*) makes this point clear. In *Burchard*, as here, pregnancy resulted from a liaison between two persons who had no prior or subsequent marital relationship, and the mother, who filed a paternity and support action, retained custody prior to trial. (*Id.* at pp. 533-534.) Our Supreme Court held: "[I]n view of the child's interest in stable custodial and emotional ties, custody lawfully acquired and maintained for a significant period will have the effect of compelling the noncustodial parent to assume the burden of persuading the trier of fact that a change is in the child's best interest." (*Id.* at p. 536.) Here, the "change" Lennane sought would have taken Ava from the only home she had ever known and relocated her cross-country to a strange household in a state where Lester had no ties. He could not meet his burden of establishing that this significant change was in Ava's best interest merely by showing that the factors favoring custody, aside from the status quo, weighed evenly between the parents—which, in essence, is what the trial court found.

Furthermore, Lennane's specific objections to the trial court's ruling are misguided, as we now show.

Lennane asserts that the trial court never made a finding that its order of primary physical custody to Lester was in Ava's best interest. He is wrong. The court stated immediately before setting out all of its custody and visitation orders: "[T]he court makes the following orders in the best interests of the child."

Lennane asserts that the trial court made inconsistent findings on the risk of moving Ava to Florida: "[T]he court found that 'moving the child to Florida at this time and placing her in an all[-]new environment would be unnecessarily disruptive to the child' and 'an unnecessary risk to take.' . . .

Yet the court also found that the evidence established that Ava 'could be moved to Florida at this time *without undue harm.'* " (Original italics.) But the trial court actually made only the first finding. Fuller quotation of the trial court's ruling discloses that the second "finding" was merely the opinion of two expert witnesses: "*Dr. Fossum and Dr. Dougherty suggest that* the child could be moved to Florida at this time without undue harm . . . ." (Italics added.) The trial court impliedly rejected that opinion. There is no inconsistency.

Lennane asserts that the trial court made inconsistent findings and orders in that it found "stability favors keeping the child's primary residence in Sacramento," yet ordered only that Ava's residence not be moved out of *California*—impliedly permitting Lester to change her residence at will within the state. Lennane asserts further that he called this problem to the trial court's attention when he requested a statement of decision, and again when he filed a "Request For Statement On Omitted Issues and For Clarification" after the court indicated it would adopt its written ruling as its statement of decision. He is mistaken on both points.

First, in the trial court's specific orders on custody and visitation schedules, which Lennane does not challenge, the court expressly requires Lester to permit visitation *in Sacramento* and to notify Lennane of any change of address within five days. Thus the trial court did not license Lester to move freely around California without regard to the stability of Ava's home life.

Second, Lennane did not call the purported inconsistency he now complains about to the trial court's attention at any time. He requested unspecified further findings as to the court's order that Ava's residence was not to be moved out of California, but he never made clear that he perceived an inconsistency between that order and the finding that stability required Ava to remain in Sacramento. Therefore the claim of error is waived. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1134 [275 Cal.Rptr. 797, 800 P.2d 1227].)

Lennane asserts that the trial court erroneously adopted the sort of " 'geographical' approach to custody" which our Supreme Court disapproved in *Burgess, supra,* 13 Cal.4th 25. He is doubly mistaken. The trial court did not base its custody determination on geography, and *Burgess* is inapposite on this point.

Geography played a part in the court's ruling only in that the parents' refusal to relocate required the court to pick either California or Florida as Ava's home state—a decision which Lennane insisted from the beginning

the court would have to make. Since Lennane had ties to California, where Ava had lived all her life, but Lester had no ties to Florida, California was the preferable site for the parents to share custody (other things being equal).

 *Burgess, supra,* 13 Cal.4th 25 is not to the contrary. In *Burgess* our Supreme Court confronted the classic "move-away" problem: a parent who had sole physical custody of a child but shared legal custody with the other parent wanted to relocate with the child to a place of residence less accessible to the noncustodial parent. (*Id.* at pp. 28-30.) The Court of Appeal had barred the custodial parent from moving against the wishes of the noncustodial parent because the custodial parent failed to show that the move was "reasonably necessary." (*Id.* at p. 31.) The high court reversed. It reasoned that under Family Code section 7501 a custodial parent has a presumptive right to change the child's residence so long as the change is not inconsistent with the child's best interest. (13 Cal.App.4th at pp. 31-32.) It therefore rejected any rule that would require a custodial parent, in order to retain physical custody, either to remain in the same location or to prove the necessity of relocating. (*Id.* at p. 34.) To that extent—and only to that extent—the high court held that geography should not determine custodial decisions. Its holding has no application to the completely different factual context of this case.

Lennane asserts: "[T]he court never found that Mother was the more capable parent." He cites no authority holding that the court could not award her custody unless it made that finding, however. A claim of legal error unsupported by authority is waived. (*Amato v. Mercury Casualty Co., supra,* 18 Cal.App.4th at p. 1794.) What the court did find is that each parent scored better on some of the applicable tests: although Lennane was more likely to allow frequent and continuing contact with the noncustodial parent and better able to provide intellectual stimulation, only Lester had experience as a primary parent.[30] In most relevant respects, the court found the parents equally "capable." Accordingly, the court used "stability" as the tiebreaker, a decision well within the court's discretion.

---

[30]Lennane characterizes the finding as to frequent and continuing contact as "most important," but cites no authority holding that this criterion must always outrank all others. The statutes he relies on do not say so. Family Code section 3040, although mentioning this factor in subdivision (a) as one "among other[s]" the trial court must consider, goes on in subdivision (b) to grant the court "the widest discretion" to fashion a custody determination in the child's best interest. Family Code section 3020 provides that the trial court must effectuate *two* public policies—that of assuring "the health, safety, and welfare of children [as] the court's primary concern" (Fam. Code, § 3020, subd. (a)) and that of assuring "that children have frequent and continuing contact with both parents" (Fam. Code, § 3020, subd. (b))—and expressly ranks the former above the latter in case of conflict. (Fam. Code, § 3020, subd. (c).)

In any event, as Lennane acknowledges, the trial court ordered Lester to undergo therapy to try to resolve her negative feelings toward him so far as they affect her ability to coparent

Finally, Lennane asserts that the trial court abused its discretion by misweighing the relevant factors. In his view, the court assigned too much weight to the status quo (allegedly created improperly in the first place by the temporary custody orders) and "biology" (i.e., the fact that Lester had physical custody from birth), while assigning too little weight to the findings that he was the parent more likely to afford frequent and continuing contact with the other parent, that Lester had unreasonably restricted his access to Ava, that she could not contemplate Ava living in Florida, and that she needed professional help to learn how to coparent with him. These arguments fail to recognize the limited scope of our review under the abuse-of-discretion standard.

 The test is not whether this court would have made the same order or whether the trial court could have reasonably made some other order, but "whether the trial court could reasonably have concluded that the order in question advanced the 'best interest' of the child." (*Burgess*, *supra*, 13 Cal.4th at p. 32.) The trial court explained at great length why it deemed its orders to be in Ava's best interest. Lennane's attack on the status quo and the court's purported reliance on it is not meritorious in light of our conclusion that Lennane has demonstrated no error in the temporary orders that created the status quo. Furthermore, he grossly overstates the case when he says that the trial court "gave no weight" to its findings that Lester was reluctant to work with him in coparenting. On the contrary, as noted in footnote 30, *ante*, the court ordered Lester to undergo therapy to deal with this problem. Thus the court gave significant weight to that finding, but determined that it did not outweigh a six-month-old infant's need for stability in maintaining the only home she had ever known. The court could reasonably determine that this exercise of its discretion was in Ava's best interest.

In Lennane's reply brief he attacks for the first time on appeal the trial court's findings that Lester, unlike Lennane, had "a proven history of being [a] primary parent" and that the court could not consider the theoretical advantages of a two-parent household over a single-parent household. Because these claims of error are raised for the first time in the reply brief, they are waived. (*Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [265 Cal.Rptr. 788].)

Lennane has shown no abuse of discretion.

---

with him. This order was tailored to deal with any reluctance Lester may have about permitting Lennane frequent and continuing contact with Ava.

Moreover, the trial court invited Lennane to move later for physical custody if he could show the requisite changed circumstances. Presumably this would include a showing that Lester had not allowed him sufficient access to Ava.

## DISPOSITION

The appeals in case Nos. C030662 and C031941 are dismissed. The judgment (order awarding primary physical custody) in case No. C032406 is affirmed. Lester shall receive her costs on appeal.

Scotland, P. J., and Davis, J., concurred.